

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-9-1996

# Marincas v. Lewis

Precedential or Non-Precedential:

Docket 95-5424

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Marincas v. Lewis" (1996). *1996 Decisions*. Paper 87.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/87

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 95-5424
_____

MIRCEA MARINCAS,
                    Appellant
          v.

WARREN LEWIS, District Director
of the United States Immigration
and Naturalization Service; U.S.
DEPARTMENT OF JUSTICE; IMMIGRATION
AND NATURALIZATION SERVICE; JANET
  RENO, Attorney General; DORIS
MEISSNER, Commissioner; JOHN LIMA,
Director of ESMOR Detention Facility;
      SEA-LAND SERVICES, INC.

_____

On Appeal from the United States District Court
        for the District of New Jersey
      D.C. Civil Action No. 95-cv-02533

_____

Argued:  March 19, 1996

Before:  BECKER, McKEE and McKAY, Circuit Judges

(Filed August 9, 1996)

                    Robert A. Perkins (ARGUED)
                    Robert A. Perkins &
                          Associates
                    213 Institute Place, Suite 501
                    Chicago, IL  60610-3125

                    Attorney for appellant

                    Daniel J. Gibbons (ARGUED)
                    Assistant U.S. Attorney
                    Faith S. Hochberg
                    United States Attorney
                    970 Broad Street, Room 502
                    Newark, New Jersey  07102

                    Attorneys for appelleees

                    Judy Rabinovitz (ARGUED)

Lucas Guttentag
Ann Parrent
Immigrants' Rights Project
American Civil Liberties Union
  Foundation
132 West 43rd Street
New York, New York  10036

Attorneys for amici curiae

Marsha Wenk
American Civil Liberties Union
  of New Jersey
2 Washington Place
Newark, New Jersey  07102

Of counsel

_____

OPINION OF THE COURT
_____

McKAY, Circuit Judge.

Petitioner-Appellant Mircea Marincas, an alien with stowaway status, applied for and was denied political asylum by the Immigration and Naturalization Service (INS).  The Board of Immigration Appeals (BIA) affirmed the denial of his application.  Mr. Marincas then sought judicial review of the BIA decision by filing a petition for a writ of habeas corpus and a complaint for injunctive and declaratory relief.  The district court denied relief.  We reverse.

I.      Factual and Procedural Background

Petitioner is a former soldier in the Romanian Army.  He claims that he expressed opposition to and questioned the legitimacy of the new Romanian government installed after the overthrow of the Communist-totalitarian government of Nicolae Ceausescu.  Mr. Marincas asserts that he was arrested, severely beaten, and threatened by Romanian authorities after he criticized the new government, which is apparently comprised almost entirely of former members of the old Communist regime. He claims that he fled Romania when he realized that he could not be safe in his homeland.

Mr. Marincas eventually arrived in the United States as a stowaway with a group of Romanian nationals on April 14, 1994, aboard a ship called the M/V Innovation.  Mr. Marincas requested asylum immediately upon his arrival in the United States, claiming he fled Romania because of political persecution.  He was detained as an excludable alien because of his stowaway status, and the INS required the owner of the M/V Innovation, Sea Land Services, Inc., to keep him in physical custody.

Mr. Marincas completed his first application for political asylum on April 17, 1994. At that time he was not informed of his right to be represented by counsel in his asylum interview or of the availability of free legal services. An INS official interviewed Petitioner, and his asylum claim was denied. Petitioner appealed to the BIA, which affirmed the INS's denial of asylum.

Petitioner then filed a habeas corpus petition seeking a stay of his deportation. The petition was dismissed after the INS conceded the inadequacy of the first proceeding and remanded the case for new proceedings. In November 1994, Petitioner was interviewed by the same asylum officer who had previously denied his claim. Petitioner was represented by counsel at the second interview, but his counsel was only allowed several minutes to question Petitioner and to advocate on his behalf. A third interview was conducted by another asylum officer after Petitioner's counsel objected to the INS about the second interview being conducted by the same asylum officer. Also, Petitioner submitted a supplemental statement in support of his application and numerous exhibits that allegedly documented the persecution he suffered in Romania. His application was again denied.

On April 7, 1995, Petitioner filed another appeal with the BIA and requested time in which to file a brief. On May 4, 1995, the BIA denied the appeal without having accepted Petitioner's brief. The BIA entered a final order of deportation for Mr. Marincas. Petitioner then initiated this action. The district court reviewed the deportation order pursuant to 8 U.S.C. § 1105a(a)(10), which permits habeas review of deportation orders. Petitioner asserted that he was denied meaningful administrative review of his application because his application was considered by an INS official instead of a neutral immigration judge and that the BIA improperly affirmed the denial of his asylum without giving him an opportunity to submit a brief. The district court denied Mr. Marincas' petition for a writ of habeas corpus. Deferring to the BIA's interpretation of the applicable immigration statutes, the district court found Mr. Marincas was provided all of the process due him on his claim for asylum. The court also found that reasonable evidence supported the INS's denial of Mr. Marincas' asylum application.

We have appellate jurisdiction to review a final order of deportation. 28 U.S.C. § 1291. Petitioner is currently in INS custody at York County Prison in York, Pennsylvania. We have not issued a formal order staying Petitioner's deportation, but the Department of Justice has agreed to comply with our request not to deport Petitioner during the pendency of this appeal.

II. United States Treaty Obligations

The United States is a signatory to the United Nations Protocol Relating to the Status of Refugees (U.N. Protocol), which incorporated the 1951 Convention Relating to the Status of Refugees. The U.N. Protocol provides:

> No Contracting State shall expel or return

("refouler") a refugee in any manner
whatsoever to the frontiers of territories
where his life or freedom would be threatened
on account of his race, religion,
nationality, membership in a particular
social group or political opinion.

United Nations Protocol Relating to the Status of Refugees, art.
33(1), Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577.
Refugees are defined as "a person who owing to well-founded fear
of being persecuted for reason of race, religion, nationality,
membership in a particular social group or political opinion, is
outside the country of his nationality and is unable or, owing to
such fear, is unwilling to avail himself of the protection of
that country." Id. art. 1.

The purpose of the Refugee Act of 1980, which
amended the Immigration and Nationality Act, was "to provide a
permanent and systematic procedure for the admission to this
country of refugees of special humanitarian concern to the United
States." Pub. L. 96-212, tit. I, § 101(b), 94 Stat. 102 (1980).
Also, the Refugee Act brought the domestic laws of the United
States into conformity with its treaty obligations under the
United Nations Protocol Relating to the Status of Refugees, Jan.
31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577. See INS v. Stevic,
467 U.S. 407, 421, 427 (1984). In response to the urgent needs
of those subject to persecution in their homelands, the Refugee
Act revised and regularized the procedures governing the
admission of refugees into the United States. Pub. L. No. 96-
212, tit. I, § 101, 94 Stat. 102 (1980). In this respect, the
Supreme Court explained:

Deportation is always a harsh measure;
it is all the more replete with danger when
the alien makes a claim that he or she will
be subject to death or persecution if forced
to return to his or her home country. In
enacting the Refugee Act of 1980 Congress
sought to "give the United States sufficient
flexibility to respond to situations
involving political or religious dissidents
and detainees throughout the world."

INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987) (citation
omitted). Thus, the Refugee Act was enacted to fulfill our
treaty obligations under the U.N. Protocol for the benefit of
aliens, such as Mr. Marincas in this case, who claim to be
fleeing persecution in their homelands.

III.    The Meaning of the Refugee Act of 1980
The district court, deferring to the BIA's
interpretation of the Immigration and Nationality Act and the
Refugee Act of 1980, concluded that the stowaways are not
entitled to immigration court hearings on their asylum claims.
We reverse the district court because the BIA's construction of
the applicable immigration statutes are contrary to clear and

unambiguous congressional intent.

A.       The Immigration and Nationality Act and the Refugee Act
         of 1980

         Aliens who arrive in the United States but are refused entry by an immigration officer are generally entitled to an exclusion hearing under the Immigration and Nationality Act (INA).  Act of June 27, 1952, tit. II, ch. 4, § 235, 66 Stat. 198 (codified at 8 U.S.C. § 1225(b) (1988)).  At the hearing, an immigration judge decides whether or not the alien should be admitted.  8 U.S.C. § 1226(a).  If the alien asserts an asylum claim, he is entitled to an asylum hearing before an immigration judge.  8 C.F.R. § 236.3(c).
         Stowaways, however, have a distinct status.  Under the INA they are excludable aliens who are not entitled to an exclusion hearing.  The INA states, "Any alien who is a stowaway is excludable."  8 U.S.C. § 1182(a)(6)(D).  The INA further provides that stowaways are not entitled to an exclusion hearing.  8 U.S.C. § 1323(d).  Section 1323(d) states, "The [exclusion hearing] provisions . . . shall not apply to aliens who arrive as stowaways and no such alien shall be permitted to land in the United States, except temporarily for medical treatment, or pursuant to such regulations as the Attorney General may prescribe for the ultimate departure or removal or deportation of such alien from the United States."  While stowaways are not entitled to an exclusion hearing, the statute permits stowaways to land in the United States pursuant to regulations prescribed for the ultimate departure, removal or deportation of the alien.
         The Refugee Act mandated for the first time that uniform procedures be established by the Attorney General for granting asylum to aliens arriving in the United States.  The Refugee Act amended the INA by providing:

                 The Attorney General shall establish a
                 procedure for an alien physically present in
                 the United States or at a land border or port
                 of entry, irrespective of such alien's
                 status, to apply for asylum, and the alien
                 may be granted asylum in the discretion of
                 the Attorney General if the Attorney General
                 determines that such alien is a refugee
                 within the meaning of section 1101(a)(42)(A)
                 of this title.

8 U.S.C. § 1158(a).  We are asked to review whether the Attorney General correctly interpreted the INA and the Refugee Act in promulgating the current asylum procedures.

B.       INS's Regulations and Asylum Procedures
         The INS regulations initially promulgated by the Attorney General pursuant to the Refugee Act made no explicit distinction between stowaways and other asylum applicants.  See Yui Sing Chun v. Sava, 708 F.2d 869, 874 (2d Cir. 1983). Instead, the INS applied the regulations differently to

stowaways.  See id.  The INS proposed regulations in 1987 that would have provided a nonadversarial procedure as the sole method of adjudicating the asylum claims of all applicants.  52 Fed. Reg. 32552-61 (1987).  The INS withdrew the proposed regulations after receiving widespread criticism that such a process was inherently inadequate as the sole adjudication of an asylum claim.  Instead, the INS issued new regulations in 1988 which provided asylum applicants an adversarial adjudication of their asylum claims through an immigration court hearing.  53 Fed. Reg. 11300 (1988).  The nonadversarial adjudication by INS officials, however, was explicitly retained in the regulations for stowaway asylum applicants.  53 Fed. Reg. 11310 (1988).

Under current INS procedures, an application for asylum is initially handled by an asylum officer.  8 C.F.R. § 208.9(a).  An immigration judge acquires jurisdiction over the asylum application if the applicant has been placed in an exclusion or deportation hearing.  8 C.F.R. §§ 208.2(b), 208.4(c).  Consequently, asylum applicants who are not stowaways cannot be removed from the United States without having their asylum claims adjudicated in an adversarial hearing before an immigration judge who is independent of the INS.  The immigration judge is required to advise the applicant that he has a right to counsel and that free legal services are available.  8 C.F.R. § 236.2(a).  At the hearing before the immigration judge, the applicant has the right to present evidence and witnesses on his own behalf, 8 C.F.R. §§ 236.2(a), 236.3(c)(3); to examine and object to adverse evidence, 8 C.F.R. § 236.2(a); to cross-examine witnesses presented by the INS, 8 C.F.R. § 236.2(a); to compel testimony of witnesses by subpoena, 8 C.F.R. § 3.35; to a transcript and record of the entire proceeding, 8 C.F.R. § 236.2(e); and to administrative review, 8 C.F.R. §§ 3.38, 236.7.

In contrast, the asylum applications of stowaways are decided in a nonadversarial interview procedure conducted by an asylum officer who is an INS employee.  8 C.F.R. §§ 208.2(a), 208.9, 253.1(f).  The stowaway applicant may have counsel present, but the regulations do not require the asylum officer to advise the applicant of his right to counsel or of the availability of free legal services.  8 C.F.R. § 208.9(b).  The stowaway applicant may present witnesses and may submit affidavits of witnesses and other evidence.  8 C.F.R. § 208.9(b).  The regulations do not require that the interview be recorded, and they require the applicant to provide his own interpreter.  8 C.F.R. § 208.9(g).  If denied asylum, the stowaway applicant may appeal his denial to the BIA.  8 C.F.R. § 253.1(f)(4).  Thus, the INS and BIA construe the INA and the Refugee Act as entitling stowaways only to a nonadversarial interview conducted by an INS asylum officer with limited due process safeguards, while all other aliens are entitled to an adversarial asylum hearing before a neutral immigration judge with a full panoply of due process safeguards.  Petitioner contends, however, that Congress intended stowaways to be afforded the same asylum procedures as other aliens.

C.        Congressional Intent

The district court deferred to the BIA's construction of the INA and the Refugee Act of 1980.  In Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 (1984), the Supreme Court established a two-step approach to judicial review of agency interpretations of acts of Congress.  First, the reviewing court must determine whether there is a clear and unambiguous congressional intent concerning the precise question in issue.  If congressional intent is clear and unambiguous, then that intent is the law and must be given effect.  A reviewing court proceeds to the second step "if the statute is silent or ambiguous with respect to the specific issue."  Id. at 843.  Then, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Id.   The Court noted:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent . . . .  If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

Chevron, 467 U.S. at 843 n.9 (citations omitted).  In this case, we do not reach the second step of Chevron because Congress expressed a clear and unambiguous intent with regard to the precise question at issue.

In construing the meaning of the Refugee Act of 1980, the Supreme Court has examined the plain meaning of the Act, its symmetry with the United Nations Protocol, and its legislative history.  See INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987).  The analytical problem in this case is similar to that in Cardoza-Fonseca:  how should changes to the INA made by Congress through the Refugee Act of 1980 be construed?  At issue in Cardoza-Fonseca was whether eligibility for asylum should be based on the "persecution or well-founded fear of persecution" standard in the Refugee Act of 1980, or on the more stringent "life or freedom would be threatened" standard originally provided in the INA.  Under the Chevron framework, the Court used traditional tools of statutory construction and examined legislative history and the United Nations protocol in determining that Congress had expressed a clear intent on the eligibility standard in enacting the Refugee Act of 1980.  Cardoza-Fonseca, 480 U.S. at 449.

In this case, the plain meaning of the Refugee Act is clear and unambiguous.  The Act provides, "The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum . . . ."  8 U.S.C. § 1158(a) (emphasis added).  The government argues that the Attorney General fulfilled this mandate by establishing one asylum procedure for stowaways and another asylum procedure for other aliens.  The plain language of

the Refugee Act leaves no room for a construction permitting differing asylum procedures for aliens based on their status: Congress plainly stated that the "Attorney General shall establish a procedure." 8 U.S.C. § 1158(a) (emphasis added); see also Yiu Sing Chun v. Sava, 708 F.2d 869, 872 (2d Cir. 1983) (finding in the legislative history of the Refugee Act that Congress directed the Attorney General to establish "'a new uniform asylum procedure'") (citing H. Conf. Rep. No. 781, 96th Cong., 2d Sess. 20 (1980), reprinted in 1980 U.S.C.C.A.N. 160, 161). Congress clearly intended a single, uniform procedure be established to satisfy our treaty obligation under the U.N. Protocol.

In mandating the establishment of a procedure for asylum applicants, Congress plainly stated in the Refugee Act that a uniform asylum hearing shall apply "irrespective of such alien's status." Section 1182(a)(6)(D) classifies stowaways as "excludable aliens," and § 1323(d) exempts stowaways from exclusion hearings. Section 1158(a), however, mandates that the asylum procedure established by the Attorney General be applied irrespective of an alien's status, which clearly would include aliens with stowaway status. Thus, under the plain meaning of the Refugee Act, Congress clearly and unambiguously intended that the Attorney General establish a uniform asylum procedure that is to be applied irrespective of an alien's status as a stowaway.

Our construction of the Refugee Act is consistent with § 1323(d) because the Attorney General can establish a uniform asylum procedure separate from the exclusion hearing. The Refugee Act mandates a uniform asylum procedure for all asylum applicants; for stowaways, the resulting hearing can be limited solely to the issue of asylum eligibility. This preserves the basic thrust of § 1323(d), which commands that stowaways are not entitled to an exclusion hearing. Yiu Sing Chun, 708 F.2d at 876.

D.       The Second Circuit's Pre-Chevron Construction of
         Stowaways under the Refugee Act

Prior to the Supreme Court's decision in Chevron, this very issue was addressed by the Second Circuit Court of Appeals in Yiu Sing Chun v. Sava, 708 F.2d 869 (2d Cir. 1983). In Yiu Sing Chun, the court examined Congress's intent in enacting the Refugee Act of 1980 and concluded that stowaways' "procedural rights as asylum applicants derive from the Refugee Act of 1980." Id. at 874. The court explained and held:

> Section 1323(d) is a specific provision detailing the treatment afforded alien stowaways. This provision must be read in light of § 1182 which defines "general classes" of "[e]xcludable aliens." Although § 1182(a)(18) lists "[a]liens who are stowaways" as an excludable class, § 1182(a) contains a proviso stating that its definitions are applicable "[e]xcept as otherwise provided in this chapter." The

Refugee Act limits the effect of § 1323(d) by "otherwise provid[ing]" that aliens applying for asylum may do so "irrespective of . . . status." 8 U.S.C. § 1158(a). Whatever procedural limitations § 1323(d) might impose in the absence of § 1158, we hold that these limitations are not applicable in the asylum context to the extent and only to the extent that an asylum determination is involved.

Yiu Sing Chun, 708 F.2d at 874-75. In ascertaining "congressional intent that the 'Attorney General . . . establish a uniform procedure for passing upon an asylum application' under the Refugee Act," the Second Circuit employed traditional tools of statutory construction, examined internal INS procedures, legislative history and the United Nations Protocol, and considered the "dictates of procedural due process." Id. at 872, 874, 875, 876, 877 n.25. Although not analyzed within the Chevron framework, Yui Sing Chun supports our conclusion that Congress clearly and unambiguously intended that the asylum procedures established by the Attorney General be applied irrespective of an alien's status as a stowaway.

E.      BIA's Inconsistent Interpretations
The Second Circuit rejected the manner in which the INS applied its regulations to stowaways and held that stowaways were entitled to "whatever other procedural rights other asylum applicants are afforded." Yui Sing Chun v. Sava, 708 F.2d 869, 876 (2d Cir. 1983). The BIA declined to follow Yui Sing Chun outside the Second Circuit. See Matter of Waldei, 19 I & N Dec. 189 (BIA 1984). In Waldei, the BIA concluded that "[t]he alien stowaway is not deprived of the opportunity to have his asylum claim considered, but in view of his status under the [INA] that opportunity is limited." Id. at 193. Thus, in Waldeithe BIA reaffirmed its approval of the INS's nonadversarial interview procedure for stowaways, despite the fact that the procedure did not require the interview to be recorded.
The BIA has subsequently acknowledged on several occasions that the stowaway asylum procedure does not produce an adequate record for review and has vacated INS asylum decisions due to the inadequate record. In this case the BIA stated, "This Board was not provided with a transcript of statements made by the applicant in his interviews with the asylum officer or with a meaningful summary of those statements, and, consequently, has no basis for evaluating any testimony presented at the interviews." Am. Stipulated J.A., No. 55 (In re Mircea Marincas, No. A70 867 421, at 2 (BIA May 4, 1995)). In a published case, the BIA has held that the record created by the stowaway asylum procedure "provides an inadequate basis for determining credibility and therefore fairly adjudicating the applicant's persecution claim." In re S-S-, Applicant, Interim Dec. (BIA) 3257 (BIA Nov. 8, 1995). The BIA in S-S-, Applicant had to remand the case to the INS so a suitable record could be produced. Id. In another case, the BIA stated in relevant part:

We are unable to enter a decision in this case on the basis of the record before us. In a notice of intent to deny dated January 27, 1993, the commissioner relied upon statements allegedly made by the applicant in his interview with the asylum officer. However, no transcript or summary of the applicant's assertions is contained in the record. Rather, the facts set forth in the notice of intent to deny constitute the only record of the applicant's interview with the asylum officer that is contained in the record file. The applicant disputes the facts reflected in the notice.

In order to fully and fairly review a decision entered in a case, this Board must have before it the primary evidentiary matters relied upon by the initial adjudicator, in this case, either a transcript of the statements made by the applicant in support of his persecution claim or a meaningful, clear, and complete summary of those statements prepared by the interviewing asylum officer. . . . The Board needs to know the questions asked an applicant, as well as his responses, before we can evaluate whether a notice of intent to deny accurately and thoroughly reflects what transpired in the proceedings before the asylum officer and whether the applicant's persecution claim was adequately developed in those proceedings. This is especially true where, as here, the applicant contends that the notice of intent to deny does not accurately reflect his claims.

Am. Stipulated J.A., No. 61 (In re Chila, No. A72 418 113, at 2 (BIA May 6, 1993) (citations omitted)). The fact that the BIA has held the asylum procedure provided stowaways is inadequate further supports our conclusion that the BIA is misconstruing the Refugee Act.

In INS v. Cardoza-Fonseca, 480 U.S. 421 (1987), the Court stated:

An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the BIA has taken through the years. An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view.

Id. at 446 n.30 (quoting Watt v. Alaska, 451 U.S. 259, 273 (1981)).  We believe the BIA's decisions in Waldei, S-S-, Applicant, and Chila reflect an inherent inconsistency in the BIA's interpretation of the Refugee Act.  In Waldei the BIA held that stowaways were only entitled to a nonadversarial interview procedure conducted by an INS asylum officer, and it implicitly approved an INS procedure that does not require the interview to be recorded.  In cases after Waldei the BIA has held that the asylum procedure for stowaways is so deficient that it cannot be effectively reviewed.  We cannot defer to the BIA's construction of the Refugee Act, which approves of the INS's asylum procedure for stowaways while condemning that same procedure as creating an inadequate record for review.

F.      Due Process Concerns under the Refugee Act
        Finally, we believe the INS and BIA are misconstruing the Refugee Act because we doubt Congress intended the Attorney General to establish an asylum procedure for stowaways that fails to provide basic due process.  "[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."  Landon v. Plasencia, 459 U.S. 21, 32 (1982).  Aliens only have those statutory rights granted by Congress.  When Congress directs an agency to establish a procedure, however, it can be assumed that Congress intends that procedure to be a fair one.  See Califano v. Yamasaki, 442 U.S. 682, 693 (1979) (assuming "a congressional solicitude for fair procedure, absent explicit statutory language to the contrary"); see also Meachum v. Fano, 427 U.S. 215, 226 (1976) (explaining that under Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974), minimum due process rights attach to statuory rights).  In this case Congress instructed the Attorney General to establish an asylum procedure, and United States' treaty obligations and fairness mandate that the asylum procedure promulgated by the Attorney General provide the most basic of due process.
        Precisely what minimum procedures are due under a statutory right depends on the circumstances of the particular situation.  See, e.g., Hewitt v. Helms, 459 U.S. 460, 472 (1983); Meachum v. Fano, 427 U.S. 215, 227 (1976).  The basic procedural rights Congress intended to provide asylum applicants under the Refugee Act are particularly important because an applicant erroneously denied asylum could be subject to death or persecution if forced to return to his or her home country.  We do not attempt to precisely detail here all of the basic procedures mandated under the Refugee Act for asylum applicants.  The current asylum procedure for stowaways, however, fails to provide two of the most basic of due process protections--a neutral judge and a complete record of the proceeding.  These inadequacies of the asylum procedures afforded stowaways are particularly troubling because they insulate the INS's denial of asylum from effective administrative and judicial review.  Although asylum applicants do not have constitutional due process protections, we believe that in accord with the U.N. Protocol,

Congress intended the Attorney General to establish a uniform asylum procedure that is fair and that applies irrespective of alien status. The existing INS asylum procedure for stowaways is inherently unfair, and, therefore, the procedure is contrary to the clear intent of Congress.

Stowaway asylum applicants must be afforded the same asylum procedures deemed necessary for other aliens. In addition to a hearing before a neutral immigration judge and a transcribed record of the proceeding, the INS regulations provide non-stowaway asylum applicants the following procedural rights: to be advised of their right to counsel and of the availability of free legal services; to a public hearing; to examine and object to adverse evidence; to compel testimony of witnesses by subpoena; and to administrative review. See 8 C.F.R. §§ 3.12, 3.35, 3.38, 236.2, 236.3, 236.7. Current INS regulations do not clearly delineate between the procedures provided aliens in exclusion hearings and asylum hearings. The above procedures, however, are provided by INS regulations to non-stowaway aliens in their asylum hearing. Under the Refugee Act, of course, the Attorney General may modify those procedures which go beyond the minimum due process rights required by fairness to which all asylum applicants are entitled.

Additionally, Petitioner asserts that the asylum procedures promulgated by the Attorney General are deficient because they fail to provide for a translator. It is difficult to imagine how any bona fide refugee, with little or no knowledge of English, could ever spontaneously convey a "well-founded fear of persecution" to an asylum officer. Courts have recognized the importance of a competent translator to ensure the fairness of proceedings to applicants who do not speak English. See, e.g., Augustin v. Sava, 735 F.2d 32, 37 (2d Cir. 1984) ("A hearing is of no value when the alien and the judge are not understood . . . . The very essence of due process is a 'meaningful opportunity to be heard.'"); see also Tejeda-Mata v. INS, 626 F.2d 721, 726 (9th Cir. 1980), cert. denied, 456 U.S. 994 (1982); Niarchos v. INS, 393 F.2d 509, 511 (7th Cir. 1968). Moreover, the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva, 1979), appropriately characterizes access to "the services of a competent interpreter" as a fundamental requirement. The United Nations Handbook "provides significant guidance in construing the [1967] Protocol, to which Congress sought to conform." INS v. Cardoza-Fonseca, 480 U.S. 421, 439 n.22 (1987). Thus, in addition to requiring the INS to apply to stowaways those procedures which are provided all asylum applicants, we also hold that at a minimum those procedures must also include the services of a translator. Otherwise, an asylum applicant's procedural rights would be meaningless in cases where the judge and asylum applicant cannot understand each other during the hearing.

We conclude that the Refugee Act of 1980 clearly and unambiguously requires that the Attorney General promulgate and apply to stowaways seeking asylum the same fair procedure as other asylum applicants and that those procedures must include

the services of a translator.

IV.      Whether Reasonable Evidence Supported the Asylum
        Application

Petitioner contends the district court erred in finding that reasonable evidence supported the INS's denial of Mr. Marincas' asylum application. We cannot address this issue because the record is inadequate. The district court's findings on this issue are necessarily vacated by our conclusion that Petitioner's asylum hearing was procedurally deficient. On remand Mr. Marincas should receive an asylum hearing which will produce a reviewable record.

The judgment of the district court will be reversed and remanded for further proceedings in accord with this opinion.


No. 95-5424
BECKER, Circuit Judge, concurring.

I join in Judge McKay's fine opinion on the understanding that it is ultimately founded not on the due process clause but on congressional intent (i.e., the intent that asylum claimants receive a uniform, fair process). However, I do not join in Judge McKay's discussion of the necessity of specific procedures, such as the need for an independent adjudicator or for a translator. I would prefer to let the INS decide in the first instance what procedures best conform to this court's mandate.