184 F.3d 337 (4th Cir. 1999)
 BESNIK SELGEKA, PETITIONER-APPELLANT,
v.
WILLIAM CARROLL, DISTRICT DIRECTOR OF THE UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE FOR THE ARLINGTON DISTRICT; DORIS MEISSNER, COMMISSIONER, IMMIGRATION AND NATURALIZATION SERVICE; JANET RENO, ATTORNEY GENERAL OF THE UNITED STATES, RESPONDENTS-APPELLEES.
 No. 97-7250
 U.S. Court of Appeals, Fourth Circuit
 Argued: June 4, 1998
Decided June 7, 1999
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Chief District Judge. (CA-97-133-A)[Copyrighted Material Omitted]
 ARGUED: Edmund Jason Albert, Covington & Burling, Washington, D.C., for Appellant. Brenda Elaine Ellison, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Appellees.
 ON Brief: Patricia A. Barald, Jonathan M. Cohen, Covington & Burling, Washington, D.C., for Appellant. Frank W. Hunger, Assistant Attorney General, David V. Bernal, Assistant Director, Office of Immigration Litigation, Civil Division, United States Department OF Justice, Washington, D.c., for Appellees.
 Before Ervin and Luttig, Circuit Judges, and Butzner, Senior Circuit Judge.
 
 
 1
 Vacated and remanded by published opinion. Senior Judge Butzner wrote the majority opinion, in which Judge Ervin joined. Judge Luttig wrote a Dissenting opinion.
 
 OPINION
 Butzner, Senior Circuit Judge
 
 2
 Besnik Selgeka, a stowaway, appeals the district court's denial of his petition for writ of habeas corpus. In his petition he challenges the denial of a full and fair opportunity to present his claim for asylum. He seeks to have his asylum application heard by an immigration Judge instead of an INS asylum officer who merely conducted an informal interview. In support of his claim he relies on statutory grounds and the Due Process Clause of the Fifth Amendment. The district court decided that the Board of Immigration Appeals (BIA) properly affirmed the denial of Selgeka's application for asylum and withholding of deportation. The government contends that this court lacks jurisdiction over Selgeka's appeal. We hold that we have jurisdiction, vacate the district court's judgment and the BIA decision, and remand this case to the appellees for a hearing before an immigration Judge.
 
 I.
 
 3
 Selgeka is an ethnic Albanian who is a native of the province of Kosovo. In January 1996, fearing persecution and conscription in the Serbian Army, he fled Kosovo and stowed away on a ship bound for the United States. Upon arriving in the United States, Selgeka orally applied for asylum with the Immigration and Naturalization Service (INS). Selgeka does not speak English, but with the help of a representative from Catholic Charities he later filed a written application for asylum in which he stated in part:
 
 
 4
 "I fear persecution if I return to Kosova....[T]he Serbs put the Albanians in the front lines, and the Albanians are not sure if they are killed by the Bosnians in the front or the Ser[b]ians behind them.... The Serbs have commi[t]ted horrible acts which I do not believe in.... To be forced to serve in the army is against my political beliefs."
 
 
 5
 Selgeka also stated that ethnic Albanians are punished more severely than other draft evaders. His brother was drafted and killed under unknown circumstances. His father, a vocal advocate for Albanians, was shot and left to die.
 
 
 6
 The atrocities by the Serbian government in Kosovo have been well documented:
 
 
 7
 "There were approximately 2,400 cases of arbitrary arrests of Albanians by Serbian authorities, and thousands more sum moned for "informative talks." Many of these individuals were beaten by the police.... Serbian police continued to raid Albanian villages, conduct indiscriminate and brutal house raids... and arbitrarily arrest and imprison individu als. Excessive force and torture during detention were often reported."
 
 
 8
 Human Rights Watch, Human Rights Watch World Report 1996, 250-51 (1996). Needless to say, the State Department considers the conditions poor. For example, the Department of State country report declared that "[w]hile the law prohibits torture, police routinely beat people severely when holding them under detention or stopping them at police checkpoints, especially targeting ethnic Albanians in Kosovo." App. 171.
 
 
 9
 Selgeka's application for asylum was referred to an asylum officer, not a Judge, who conducted an interview and denied the application on June 18, 1996. The asylum officer made an "adverse credibility" finding and decided that Selgeka was
 
 
 10
 "unable to offer more than very generalized details about the problems the Kosovar Albanians have been experiencing under [the] Serbian government over the past few years... [and Selgeka's] contention that Kosovar Albanians are forc ibly recruited into the Yugoslav army to fight in Bosnia is not supported by independent sources."
 
 
 11
 App. 136. No court reporter was present, and a transcript was not made. Instead, the asylum officer condensed the four-hour interview into a nine-page handwritten report.
 
 
 12
 Reviewing the asylum officer's "adverse credibility finding," the BIA stated that Selgeka's "testimony is consistent, logical, and supported by the corroborative evidence submitted in rebuttal of the director's notice of intent to deny." App. 102.
 
 
 13
 The BIA emphasized, however, that a government has the right to require military service and to enforce this requirement with reasonable penalties. To this well-established ground for denying asylum there are two exceptions:
 
 
 14
 "(1) the alien would be associated with a military whose acts are condemned by the international community as contrary to the basic rules of human conduct, or (2) refusal to serve in the military results not in normal draft evasion penalties, but rather in disproportionately severe punishment on account of one of the five grounds enumerated in section 1101(a)(42)(A) of the Refugee Act."
 
 
 15
 M.A. v. United States INS, 899 F.2d 304, 312 (4th Cir. 1990) (en banc). Selgeka offered evidence concerning the especially harsh treatment that ethnic Albanians who refused to serve in the military received, but the BIA found it insufficient to establish Selgeka's asylum eligibility. It denied Selgeka's application for asylum on October 22, 1996.
 
 
 16
 Selgeka sought a writ of habeas corpus in the United States District Court for the Eastern District of Virginia to assert his claim that he was denied due process because an asylum officer interviewed him instead of allowing him a hearing before an immigration Judge. The district court denied Selgeka's habeas petition on June 9, 1997, holding he had waived his constitutional due process claim by not raising it before the BIA and because the BIA's opinion was supported by substantial evidence. Based on 8 U.S.C. § 1323(d), the district court also concluded that a stowaway was not entitled to a hearing before an immigration Judge.
 
 II.
 
 17
 Selgeka relies on 28 U.S.C. §§ 2241 (habeas corpus) and 1331 (federal question) for jurisdiction. In the district court, the government, responding to Selgeka's petition for writ of habeas corpus, stated that the court had jurisdiction to review this case pursuant to 28 U.S.C. § 1331. Apparently because of the government's representation, the district court did not discuss jurisdiction. Be that as it may, courts can consider subject matter jurisdiction whenever raised. United States v. White, 139 F.3d 998, 999-1000 (4th Cir. 1998).
 
 
 18
 The government now contends that Selgeka's appeal should be dismissed because the Immigration and Nationality Act (INA), 8 U.S.C. § 1252(g), as amended by section 306(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009-612, deprives both this court and the district court of jurisdiction to hear Selgeka's case. Specifically, the government relies on a clause that authorizes the Attorney General to adjudicate cases. The amended Act provides:
 
 
 19
 "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to com mence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."
 
 
 20
 8 U.S.C. § 1252(g).
 
 
 21
 The IIRIRA did not take effect until April 1, 1997, and the transitional rules of the IIRIRA preclude it from applying to pending cases, such as Selgeka's. IIRIRA § 309(c). Section 306(c)(1), however, carves out an exception to the transitional rules by providing that section 1252(g) applies to all past, pending, and future cases.
 
 
 22
 We held this case in abeyance pending the decision of Reno v. American-Arab Anti-Discrimination Committee, 119 S. Ct. 936 (1999) (AADC II), which dismissed a claim of allegedly selective prosecution brought by resident aliens against the Attorney General.
 
 
 23
 The Court did not decide the question whether section 1252(g) precludes judicial review of habeas claims but noted that the courts of appeals disagree on the point. Id. at 942 n.7. None of the lower court cases cited by the Supreme Court dealt with an asylum claim. Nevertheless, the Court's interpretation of section 1252(g) in AADC II is instructive. The Court rejected the notion that section 1252(g) "covers the universe of deportation claims." 119 S. Ct. at 943. It concluded instead that section 1252(g) "applies only to three discrete actions that the Attorney General may take: her `decision or action' to `commence proceedings, adjudicate cases, or execute removal orders.'" (emphasis in original). Id. In significantly narrowing the coverage of section 1252(g), the Court reasoned that Congress intended to protect discretionary decisions of the Executive from judicial review in the context of the Attorney General's decision to "abandon the endeavor... for humanitarian reasons or simply for its own convenience." Id. This practice came to be known as "deferred action." Id. Justice Scalia, writing for the Court, noted that "no generous act goes unpunished" and explained that "exercise of this discretion opened the door to litigation in instances where the INS chose not to exercise" its discretion. Id. at 944. The Court summed up its decision by saying:
 
 
 24
 "Section 1252(g) seems clearly designed to give some mea sure of protection to "no deferred action" decisions and sim ilar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the stream lined process that Congress has designed. (footnote omitted)" Id.
 
 
 25
 The Court's interpretation of section 1252(g) discloses that this statute does not preclude jurisdiction over Selgeka's plea for an immigration Judge to hear his application for asylum and to prepare an administrative record, including a transcript of the evidence that is suitable for review. Selgeka does not challenge the Attorney General's authority to adjudicate cases. He expressly recognizes that the Attorney General, through its designee, the BIA, will eventually adjudicate his case.
 
 
 26
 We conclude that jurisdiction is founded on 28 U.S.C. §§ 2241 and 1331.
 
 III.
 
 27
 We review de novo the district court's denial of the writ and its interpretation of the Refugee Act. The district court's Conclusion that the BIA's decision is supported by substantial evidence is reviewed de novo, but the BIA's factual findings may not be reversed unless the evidence compels a contrary Conclusion. Chen Zhou Chai v. Carroll, 48 F.3d 1331, 1338 (4th Cir. 1995).
 
 
 28
 Selgeka does not ask us to reverse the BIA and grant him asylum. Instead, he alleges he was denied procedural due process. He seeks the minimum procedures of due process--the opportunity to have his claim of asylum heard by an impartial immigration Judge together with the incidents of such a hearing. In assessing his claim, we follow generally the Third and Second Circuits--Marincas v. Lewis, 92 F.3d 195 (3d Cir. 1996), and Yiu Sing Chun v. Sava, 708 F.2d 869 (2d Cir. 1983); see also Amaritei v. Ferro, No. MJG 96-1874 (D. Md. 1996).
 
 
 29
 It is clearly established that aliens have only those rights Congress sees fit to provide. Aliens have no independent constitutional rights in an asylum procedure. Landon v. Plasencia, 459 U.S. 21, 32 (1982). "When Congress directs an agency to establish a procedure, however, it can be assumed that Congress intends that procedure to be a fair one." Marincas, 92 F.3d at 203 (citing Califano v. Yamasaki, 442 U.S. 682, 693 (1979)). See also Meachum v. Fano, 427 U.S. 215, 226 (1976) (minimum due process rights attach to statutory rights). An asylum applicant is entitled to the minimum due process that these cases envision. See Yiu Sing Chun, 708 F.2d at 876-77; Augustin v. Sava, 735 F.2d 32, 37 (2d Cir. 1984) (asylum applicant has a due process right to a translator at an asylum hearing).
 
 
 30
 The linchpin of Selgeka's case is 8 U.S.C.A. § 1158(a) (1995), in which Congress spoke in no uncertain terms about asylum: "The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum...." We start our statutory analysis by recognizing that "[u]nder the most basic canon of statutory construction, we begin interpreting a statute by examining the literal and plain language of the statute." Carbon Fuel Co. v. USX Corp., 100 F.3d 1124, 1133 (4th Cir. 1996) (citations omitted). The government points to no explicit legislative intent to the contrary. We note that Congress directed the Attorney General to establish a procedure. It did not authorize her to establish procedures. A procedure has been defined as "the established manner of conducting judicial business and litigation including pleading, evidence, and practice." Webster's Third New International Dictionary (1986). Status is defined as "the condition (as arising out of... alienage...) of a person that determines the nature of his legal personality, his legal capacities, and the nature of the legal relations to the state or to other persons into which he may enter." Id. The proper interpretation of § 1158(a) (1995) places upon the Attorney General the obligation to establish a single procedure for asylum claims that apply to all applicants without distinction.
 
 
 31
 Congress has stated that the purpose of the 1980 Refugee Act, which includes section 1158, was to "give statutory meaning to our national commitment to human rights and humanitarian concerns." 125 Cong. Rec. 23232 (1979). The United States is a signatory to the United Nations Protocol Relating to the Status of Refugees. In part, the Protocol requires that a "refugee have free access to the courts of law" of the United States. Protocol Relating to the Status of Refugees, Jan. 31, 1967, art. 1, para. 1, 19 UST 6223, 6225 (incorporating Convention Relating to the Status of Refugees, July 28, 1951, art. 16, para. 1, 19 UST 6268). The Refugee Act was also intended to bring the INA and the nation's domestic laws into conformity with our treaty obligations. INS v. Cardoza-Fonseca, 480 U.S. 421, 424 (1987); see generally Marincas, 92 F.3d at 197-98. The term "refugee" includes:
 
 
 32
 any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protec tion of, that country because of persecution or a well founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....
 
 
 33
 8 U.S.C. § 1101(a)(42)(A). The Attorney General has discretion to grant asylum to a refugee. Cardoza-Fonseca, 480 U.S. at 428 n.5.
 
 
 34
 Generally under the INA, aliens are entitled to either an exclusion or deportation hearing before being excluded or deported from the United States. 8 U.S.C. § 1225(b). Stowaways, however, are an exception to this general rule and are not entitled to an exclusion or deportation hearing pursuant to the INA. 8 U.S.C.§ 1323(d). The Attorney General's regulations, which are applicable to this case, place great significance on this difference. Under the Attorney General's regulations aliens who are entitled to an exclusion or deportation hearing are allowed to present their asylum claims to an immigration Judge at an exclusion or deportation hearing. 8 C.F.R. § 236.3(c) (1997). Because stowaway asylum applicants are not entitled to a deportation or exclusion hearing, the regulations afford them no opportunity to present their asylum claims to an immigration Judge. Under the statutes in effect when the BIA denied Selgeka's claim the different treatment stowaway asylum applicants received was attributable to the Attorney General's regulations, not the INA. Although the INA prevents stowaways from having an exclusion or deportation hearing, nothing in the INA prevents a stowaway from receiving an asylum-only hearing conducted by an immigration Judge. See Marincas, 92 F.3d at 201; Yiu Sing Chun, 708 F.2d at 874-75.
 
 
 35
 All asylum applications are first given to an asylum officer for an interview. 8 C.F.R. § 208.9(a) (1997). We are unable to accept the government's claim that this interview satisfies§ 1158(a)'s mandate that the Attorney General establish an asylum procedure applicable to all aliens irrespective of status. The procedures for nonstowaways and stowaways are different. Nonstowaway applicants for asylum generally have their asylum claims adjudicated by an immigration Judge at the deportation or exclusion hearing to which they are entitled. See 8 C.F.R. § 208.2. In contrast, because a stowaway is not entitled to a deportation or exclusion hearing, the Attorney General's regulations deny him a hearing before an immigration Judge.
 
 
 36
 Unlike asylum officers who are employees of the INS, immigration Judges are independent of the INS. See Marincas, 92 F.3d at 199. Unlike the informal, non-adversarial interview conducted by an asylum officer, an asylum applicant at an exclusion or deportation hearing is entitled to many procedural rights. The immigration Judge must inform the applicant that he has the right to counsel and that free legal services are available. 8 C.F.R. § 236.2(a) (1997).
 
 
 37
 At the hearing before the immigration Judge, the applicant has the right to present evidence and witnesses on his own behalf, to examine and object to adverse evidence, to cross examine witnesses presented by the INS, to compel testi mony of witnesses by subpoena, to a transcript and record of the entire proceeding, and to administrative review.
 
 
 38
 Marincas, 92 F.3d at 199 (citations omitted). The applicant is also entitled to an official interpreter if the need arises.
 
 
 39
 In Marincas, a stowaway petitioned for writ of habeas corpus based on the treatment he received under the Attorney General's regulations. Id. at 200-01. The Third Circuit held that the Attorney General's regulations, which denied stowaways the rights of other asylum applicants, were inconsistent with section 1158(a)'s requirement that the Attorney General establish a procedure irrespective of an alien's status. It also held that the differing treatment stowaways received denied the applicant the most basic due process and was contrary to Congressional intent. Id. at 200, 203. The Third Circuit explained that its interpretation of § 1158(a) was consistent with § 1323(d)'s provision that stowaways are not entitled to exclusion or deportation hearings.
 
 
 40
 Our construction of the Refugee Act is consistent with § 1323(d) because the Attorney General can establish a uni form asylum procedure separate from the exclusion hearing. The Refugee Act mandates a uniform asylum procedure for all asylum applicants; for stowaways, the resulting hearing can be limited solely to the issue of asylum eligibility.
 
 
 41
 Id. at 201.
 
 
 42
 The Second Circuit has also held that a refugee is entitled to some due process and that the Refugee Act limits the effect of section 1323(d):
 
 
 43
 "The Refugee Act limits the effect of § 1323(d) by "other wise provid[ing]" that aliens applying for asylum may do so "irrespective of status." Whatever procedural limitations § 1323(d) might impose in the absence of § 1158, we hold that these limitations are not applicable in the asylum con text to the extent and only to the extent that an asylum deter mination is involved."
 
 
 44
 "[O]ur construction of the statute and the regulations is aided to some extent, if not guided, by what we perceive to be the dictates of procedural due process."
 
 
 45
 Yiu Sing Chun, 708 F.2d at 874-76 (citations omitted). As these cases explain, section 1323(d)'s prohibition with regard to exclusion hearings need not spill over into the asylum context. Sections 1323 and 1158 are not inconsistent. The problem lies with the Attorney General's procedures. By tying asylum applications to exclusion or deportation hearings the Attorney General has created two asylum procedures instead of one--the first for applicants who receive an exclusion or deportation proceeding and the second for applicants who do not. This violates section 1158(a), which allows aliens, irrespective of "status," to apply for asylum and directs the Attorney General to establish a "procedure" for asylum claims.
 
 
 46
 The government maintains, however, that Selgeka waived his constitutional claim. It relies on the district court's opinion which held that Selgeka waived his due process argument by failing to raise it in his appeal to the BIA. The district court, however, predicated its ruling upon the mistaken impression that Selgeka was represented by an attorney at both the interview and before the BIA.
 
 
 47
 Generally, any claim not raised before the BIA is waived. Farrokhi v. United States INS, 900 F.2d 697, 700 (4th Cir. 1990). Nevertheless, failure to raise a claim acts as a waiver only when it is done knowingly and voluntarily. See Green v. United States, 355 U.S. 184, 191 (1957). Nothing in the record suggests that Selgeka made a knowing and intelligent decision to waive his due process claim. Though Selgeka was represented by an accredited representative, who is a law school graduate, from the Refugee and Immigration Services of the Catholic Diocese of Richmond, he was not represented by an attorney at the BIA hearing. Nothing in the record suggests that Selgeka and his lay representative were familiar with the Due Process Clause or with the repercussions of failing to make a constitutional claim before the BIA. Under these circumstances we are not convinced that his was a knowing and intelligent decision. We also note that a claim is not waived when it would be futile to raise it. See El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review, 959 F.2d 742, 747-48 (9th Cir. 1991). The BIA and the INS have consistently opposed affording stowaway asylum applicants the same rights as other asylum applicants. See Marincas v. Lewis, 92 F.3d 195, 199 n.3 (3d Cir. 1996). For example, after the Second Circuit held that stowaway asylum applicants were entitled to a hearing conducted by an immigration Judge, the INS refused to afford them hearings outside of the Second Circuit. Id. Yiu Sing Chun v. Sava, 708 F.2d 869, 874-76 (2d Cir. 1983). Clearly, Selgeka's attempt to obtain due process would have been futile.
 
 IV.
 
 48
 The standard for review of the BIA decision is whether it is supported by reasonable, substantial, and probative evidence. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). Based on the deficient procedures to which Selgeka was limited, we are unable to give the BIA decision the searching review that it deserves. It is impossible to fairly determine whether the Board's decision is supported by reasonable, substantial, and probative evidence. Because a complete transcript of the asylum interview was not made, there is no process this court can use to determine if the evidence compels a contrary factual Conclusion. The asylum officer condensed a four hour interview into a ninepage handwritten report. Clearly more was said in the four-hour interview than was recorded. On remand Selgeka should receive an asylum hearing, consistent with this opinion, that will produce a reviewable record. See Marincas, 92 F.3d at 202, 204.
 
 
 49
 With these due process concerns in the forefront, to hold that an asylum applicant is entitled to a fair proceeding before an impartial Judge is not a great leap of faith. An interview is hardly the forum to adjudicate human rights.
 
 
 50
 In concert with the Second and Third Circuits and the District of Maryland, we hold that a stowaway is entitled to an asylum hearing conducted by an immigration Judge together with the incidents of such a hearing. We are unaware of any case to the contrary except the case before us; the government has cited none.
 
 V.
 
 51
 On June 9, 1998, the Attorney General permitted eligible residents of Kosovo to apply for Temporary Protected Status (TPS). 63 Fed. Reg. 31,527 (June 9, 1998). The INA authorizes the Attorney General to grant TPS to eligible nationals of foreign states that are experiencing ongoing civil strife. Id. An alien may apply for TPS even if he is considered a "nonimmigrant" or has an "unlawful status." Id. at 31,528. In allowing Kosovo aliens to apply for TPS the Attorney General stated:
 
 
 52
 "There exists an ongoing armed conflict in the Province of Kosovo in the Republic of Serbia... and, due to such con flict, the return of aliens who are residents of Kosovo Prov ince... would pose a serious threat to their personal safety as a result of the armed conflict in that province;"
 
 
 53
 "There exists extraordinary and temporary conditions in Kosovo Province that prevent aliens who are residents of Kosovo Province... from returning to Kosovo Province in safety.
 
 
 54
 Id. at 31,527. TPS does not preclude or adversely affect an application for asylum. Nor does this proceeding adversely affect Selgeka's opportunity to apply for TPS. Id. It does, however, corroborate to a certain extent Selgeka's "credible fear of persecution."
 
 VI.
 
 55
 In sum, we hold that we have jurisdiction to review Selgeka's application for habeas corpus and that Selgeka is entitled to a hearing before an immigration Judge. We vacate the district court's judgment and the decision of the BIA. We remand this case to the appellees for proceedings consistent with this opinion.
 
 VACATED AND REMANDED
 LUTTIG, Circuit Judge, Dissenting:
 
 56
 In concluding that the INS was required to provide appellant with an asylum hearing before an immigration Judge, the majority misinterprets the statute in force at the time of appellant's asylum application. That statute read:
 
 
 57
 "The Attorney General shall establish a procedure for an alien physically present in the United States or at a land bor der or port of entry, irrespective of such alien's status, to apply for asylum...."
 
 
 58
 8 U.S.C. § 1158(a) (1994) (emphases added). The majority interprets the statutory phrase "a procedure" to mean "one and the same procedure," and the phrase "an alien... irrespective of such alien's status" to mean "all aliens... irrespective of their statuses." The majority thus holds that, under the statute, the Attorney General was required to provide the same procedure for all aliens, and that, by allowing only aliens entitled to an exclusion or deportation hearing to have their asylum claims heard before an immigration Judge, see 8 C.F.R. § 208.2(b) (1994), and all other aliens to have their claims heard only before an asylum officer, see id. § 208.9(a), the Attorney General violated her statutory obligation.
 
 
 59
 The majority offers no explanation for this interpretation; instead, it simply asserts, in ipse dixit, that the"proper interpretation" of this provision requires a "single procedure" for"all applicants." Ante at 8. From its "note" and emphases, see id. at 8, the majority appears to believe that its interpretation is compelled because Congress employed in the statute the singular "procedure," rather than the plural "procedures," although the majority's thinking is less than clear because it ultimately directs our attention not so much to Congress' usage of the singular (as its emphases forecast that it would do) but instead to the definition of "procedure" --a definition which (like the also-recited definition of "status") has no evident bearing on the question of whether multiple procedures are permissible under the statute. If this were the majority's belief, then it would seem fairly obviously incorrect. That Congress directed the Attorney General to establish "procedure" rather than "procedures" for aliens to apply for asylum is no evidence at all that Congress intended that the identical procedure be established for all aliens -- as the majority's dictionary definition of "procedure," which is utterly neutral as to the word's singularity or plurality, confirms. If Congress had instructed the Attorney General to "establish procedures for an alien... to apply for asylum," I am confident that the majority would not, because of that pluralization, interpret the statute differently so as to permit different procedures for different classes of aliens.
 
 
 60
 Presumably, then, the majority actually believes that its interpretation is compelled not because Congress used the singular word "procedure," but rather because Congress required the Attorney General to establish "a procedure," rather than "procedures." See ante at 8 (apparently drawing inference from use of the singular phrase "a procedure" that Congress obligated the Attorney General to establish "a single procedure for asylum claims that apply to all applicants without distinction."); id. at 11 (asserting that section 1158(a) "directs the Attorney General to establish a `procedure' for asylum claims" (emphasis added)). If one were, as the majority almost certainly has done, to read the phrase "a procedure" in isolation from the remainder of the provision (and in contrast to the plural"procedures"), it would not be wholly implausible to conclude that a single procedure is mandated. However, if one parses the entire statute as finely as the majority unsuccessfully attempts to parse only the one phrase "a procedure," it is apparent that Congress did not mandate the same procedure for all aliens applying for asylum, but rather that it mandated only "a procedure" -- that is, some unspecified type of procedure -- for "an alien[,]... irrespective of such alien's status" -that is, for each alien. In other words, because Congress used both the indefinite, singular phrase "a procedure" and the indefinite, singular phrase "an alien," it necessarily required only that some procedure be available for each alien; it did not require that the identical procedure be available for all aliens (as would arguably be the case if Congress used the singular "procedure" and the plural"aliens"), or that several procedures be available for each alien (as would arguably be the case if Congress used the plural "procedures" and the singular "alien"), or that several and the same procedures be available for all aliens (as would arguably be the case if Congress used the plural "procedures" and the plural "aliens"). If the majority had parsed the entire provision, and in particular had considered Congress' use of the indefinite singular phrase "an alien" (not to mention the related singular phrase "such alien's status"), I have to think the majority would have agreed that Congress never intended to require the Attorney General to establish the identical procedure for all aliens seeking asylum. But at the very least it would have realized that it could not possibly reach the Conclusion that it does by invoking the reasoning that it does herein.
 
 
 61
 That the majority has fundamentally erred in its interpretation of the statute need not be the subject of conjecture: in the very passage in which it summarizes its understanding of the statute, the majority states, in obvious but mistaken belief that it is simply reciting the language of the statute, that section 1158(a) "mandate[s] that the Attorney General establish an asylum procedure applicable to all aliens irrespective of status." Ante at 9 (emphases added); see also id. at 11 (stating, again in error, that section 1158(a) "allows aliens, irrespective of `status,' to apply for asylum"). Of course, the statute does not require the Attorney General to establish "an asylum procedure" for "all aliens," but rather "an asylum procedure" for "an alien" -- and not even this, "irrespective of status," but rather "irrespective of such alien's status." The majority's misreading of the statute could hardly be plainer.
 
 
 62
 Having been offered no reason to do otherwise by the majority, I would simply read the statute, as it is written, to require only that the INS make some type of procedure -- not necessarily the same procedure --available to each alien in order that his asylum claim might be heard. Not only is this the plain-language interpretation of section 1158(a), but it is the interpretation that common sense tells one that Congress intended in this statute. Congress' intent was manifestly to ensure that no alien was without a procedure for applying for asylum, not that every alien be provided the same procedure.
 
 
 63
 The majority's reading of section 1158(a) has few implications beyond the instant case, because a provision of IIRIRA, not applicable to this case but now in effect, requires the INS to provide all asylum applicants with a hearing before an immigration Judge. See 8 U.S.C. § 1225(b)(1)(B)(iii)(III). Of greater concern, however, is the majority's unwillingness to distinguish between two entirely unrelated inquiries: whether the INS was required to provide appellant with an immigration Judge as a matter of statutory interpretation, and whether the INS was required to do so as a matter of constitutional due process. The majority confuses and thus conflates these two separate inquiries, as the following sequential sentences of the majority's opinion amply demonstrate:
 
 
 64
 [The dual-track procedure] violates section 1158(a), which allows aliens, irrespective of "status," to apply for asylum and directs the Attorney General to establish a"procedure" for asylum claims.
 
 
 65
 The government maintains, however, that Selgeka waived his constitutional claim.
 
 
 66
 Ante at 11 (emphases added).
 
 
 67
 I am confident that the INS' decision not to afford appellant an asylum hearing before an immigration Judge did not deprive appellant of any constitutional rights. For its contrary Conclusion, the majority provides no serious constitutional analysis, but instead simply makes a series of bald assertions: first, that appellant's failure to exhaust his constitutional claims before the BIA was excused because he did not knowingly and voluntarily waive those claims (on the ground that there was no affirmative evidence of such a waiver in the record, beyond his failure to raise the claim despite his representation by experienced counsel); second, that appellant's failure to exhaust was excused because it would have been futile to raise such claims before the BIA (on the ground that the BIA "consistently" rejects the claims of stowaways); and third, that appellant's due process rights were violated (on the ground that "[a]n interview is hardly the forum to adjudicate human rights"). It seems to me that, in this circumstance, to recite the majority's constitutional analysis is sufficient to expose it for its inadequacy.
 
 
 68
 I respectfully Dissent.