**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1280

SONIA CALLA MEJIA, a/k/a Sonia Calla-Mejia,

Petitioner,

v.

JEFFERSON B. SESSIONS III, Attorney General; ELAINE DUKE, Acting Secretary of the Department of Homeland Security,

Respondents.

------------------------------

AMERICAN IMMIGRATION LAWYERS ASSOCIATION; NATIONAL IMMIGRANT JUSTICE CENTER,

Amici Supporting Petitioner.

On Petition for Review of an Order of the Department of Homeland Security.

Argued: March 23, 2017                    Decided: August 9, 2017

Before TRAXLER, DIAZ, and FLOYD, Circuit Judges.

Petition for review dismissed in part and denied in part by published opinion. Judge Diaz wrote the majority opinion, which Judge Floyd joined in full and Judge Traxler joined in part. Judge Traxler wrote an opinion dissenting in part.

**ARGUED:** Morgan L. Goodspeed, HOGAN LOVELLS US LLP, Washington, D.C., for Petitioner. Manuel Alexander Palau, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Catherine E. Stetson, Evan W. Guimond, Hamida B. Owusu, Mary S. Van Houten, HOGAN LOVELLS US LLP, Washington, D.C., for Petitioner. Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Terri Scadron, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Mark Barr, LICHTER IMMIGRATION, Denver, Colorado; Charles Roth, Keren Zwick, NATIONAL IMMIGRANT JUSTICE CENTER, Chicago, Illinois, for Amici Curiae.

---

DIAZ, Circuit Judge:

After enduring years of domestic abuse at the hands of her husband, a Peruvian National Police Officer, Sonia Calla Mejia fled her native Peru and entered the United States illegally in April 2015. The Department of Homeland Security ("DHS") detained Calla Mejia and, following a June 2015 hearing before an Immigration Judge ("IJ") in Texas, removed her to Peru.

Months later, Calla Mejia attempted to re-enter the United States, and was again apprehended by DHS, which reinstated her previous removal order. When Calla Mejia sought asylum, DHS placed her in "withholding of removal-only" proceedings and deemed her ineligible to apply for asylum because of her reinstated removal order. An IJ in Maryland concluded that Calla Mejia was ineligible for asylum but granted her withholding of removal.

Before us, Calla Mejia contends that, irrespective of her status, she is entitled to apply for asylum under 8 U.S.C. § 1158, or, alternatively, because defects in the June 2015 proceedings render the underlying removal order invalid. The government counters that we lack jurisdiction over Calla Mejia's appeal. On the merits, the government asserts that 8 U.S.C. § 1231(a)(5) categorically prohibits individuals with reinstated orders of removal from applying for asylum relief, and, alternatively, rejects Calla Mejia's objections to the June 2015 hearing as meritless.

As we explain, we have jurisdiction to consider Calla Mejia's statutory claim but not her challenges to the June 2015 removal order. With respect to the statutory claim, we hold that Congress has directly spoken to the precise question at issue: an alien

3

subject to a reinstated removal order—like Calla Mejia—is precluded from applying for asylum. Accordingly, we dismiss Calla Mejia's petition for review in part and deny the petition in part.

## I.

The first time Calla Mejia fled Peru, she waded across the Rio Grande from Mexico into the United States, where she was apprehended by U.S. Customs & Border Patrol near Laredo, Texas. Calla Mejia told Border Patrol agents that she came to the United States to "reside and work in New York" for a period of five years.[1] A.R. 218.

While in detention, Calla Mejia was referred to an asylum officer, who conducted a credible-fear interview. Calla Mejia informed the asylum officer that she had been threatened, brutally beaten, and raped by her husband for several years. She explained that when she reported his abuse to the police in Peru, "after [she] told them [her] husband was a police officer they just left [her] there waiting and they never helped [her]." A.R. 212. Calla Mejia told the asylum officer that she couldn't live safely anywhere in Peru because her husband—using the investigative resources at his disposal as a police officer—would undoubtedly look for her and harm her. The asylum officer concluded that Calla Mejia had demonstrated a credible fear of returning to Peru and

---

[1] The parties dispute whether and when Calla Mejia expressed fear of returning to Peru. No stretch of logic is required to conclude that Calla Mejia did at some point express fear, as she was undisputedly referred to an asylum officer. *Cf.* 8 U.S.C. § 1225(b)(1)(A)(ii) (providing that an immigration officer "shall refer [an] alien for an interview by an asylum officer" if the alien expresses "an intention to apply for asylum" or indicates "a fear of persecution").

4

Calla Mejia was consequently placed in a full removal proceeding pursuant to 8 U.S.C. § 1229a.

After DHS served her with a Notice to Appear, Calla Mejia appeared pro se before an IJ in Texas. This June 2015 Master Calendar Hearing was consolidated with the hearings of seven other women and conducted by the IJ via videoconference.[2] Through a Spanish-language interpreter, the IJ advised the women of their rights in the removal proceedings, including their right to apply for asylum, withholding of removal, and protection under the Convention Against Torture. The IJ also spoke at length about credibility, explaining:

> By now each of you have given at least two separate sworn statements. You gave one to the border patrol when you were apprehended and another to the asylum officer. If those two statements are not consistent with each other you have a credibility problem. Credibility problems are extremely difficult to overcome under our law.

A.R. 556–57.

The IJ then addressed Calla Mejia individually. Calla Mejia confirmed that she understood her rights as explained. The IJ noted that Calla Mejia "told the second officer [she was] fearful of returning to [her] country," but that she "told the first officer [she was] going to live in New York for five years and [she was] not afraid to return." A.R. 561–62. The IJ informed Calla Mejia, "if you want to apply for asylum, withholding of

---

[2] A Master Calendar Hearing is typically an alien's first appearance before an IJ in removal proceedings. As a general matter, the purpose of the hearing is to explain to the alien the charges of removability, advise the alien of her rights in the proceedings, ask the alien whether she admits or denies the factual allegations and her removability under the charges, and schedule additional hearings. *See* 8 C.F.R. § 1240.10.

removal and Convention Against Torture relief, I will allow it, but I should tell you, you have a credibility problem. A serious one." A.R. 562. Calla Mejia subsequently declined to apply for relief, accepted the order of removal, and waived her right to appeal. The IJ issued a final order of removal, and Calla Mejia was removed to Peru on June 22, 2015.

Once removed, Calla Mejia returned to her family home in Peru. Her husband soon learned that she was back, entered her family's house, attacked her, and raped her. Calla Mejia then fled to the United States a second time, where she was immediately apprehended and detained by Border Patrol. Pursuant to 8 U.S.C. § 1231(a)(5), DHS reinstated Calla Mejia's June 2015 order of removal.

Calla Mejia was subsequently transferred to a detention center in Maryland, where, after she expressed a fear of returning to Peru, an asylum officer conducted a reasonable-fear interview. The asylum officer found that Calla Mejia credibly established a reasonable fear of persecution in Peru. But because Calla Mejia remained subject to a reinstated order of removal, DHS placed her in "withholding-only" proceedings.

With the aid of counsel, Calla Mejia filed a Form I-589 application and supporting briefs asserting her eligibility for asylum, withholding of removal, and Convention Against Torture protection. Calla Mejia contended that despite her placement in withholding-only proceedings, she was statutorily eligible to apply for asylum. Alternatively, Calla Mejia argued that her original removal order was invalid due to constitutional defects in the June 2015 hearing in Texas.

6

Calla Mejia appeared before the IJ in February 2016. Her counsel urged that Calla Mejia was eligible to apply for asylum.[3] But the IJ responded that the reinstated removal order rendered Calla Mejia ineligible for asylum and concluded that she lacked the authority to consider the application for asylum. At that point, Calla Mejia's counsel withdrew the application.

Calla Mejia testified regarding the domestic abuse she had suffered and her fear of returning to Peru. The IJ granted Calla Mejia's application for withholding of removal, finding that Calla Mejia credibly established past persecution in the form of domestic violence, the Peruvian government's inability or unwillingness to protect her, and her inability to relocate safely elsewhere in Peru. Calla Mejia and DHS waived appeal of the IJ's ruling.

This petition for review followed.

## II.

We begin with a brief overview of the relevant statutory provisions of the Immigration and Nationality Act ("INA"). Calla Mejia's claim that she is entitled to seek asylum notwithstanding her reinstated removal order centers on the relationship between two statutes: 8 U.S.C. § 1158, the asylum statute, and 8 U.S.C. § 1231(a)(5), the reinstatement bar. Before discussing these provisions, we first examine the distinction

---

[3] Calla Mejia's counsel requested that DHS re-charge Calla Mejia and seek her removal in a full proceeding, rather than by reinstatement, so that she could apply for asylum. DHS declined to exercise prosecutorial discretion.

between withholding of removal, which the IJ granted to Calla Mejia in the February 2016 proceedings, and asylum, which Calla Mejia continues to seek.

A.

Eligibility for the discretionary relief of asylum requires an alien to show that she is a "refugee," or a person "unable or unwilling to return to" a country because she has a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (defining the term "refugee"); 8 C.F.R. § 1208.13(b) (providing eligibility standard). Critically, "the Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987). Instead, "the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999).

By contrast, "[i]f an applicant for withholding of removal establishes her claim, the Attorney General *cannot* remove her to her native country." *Anim v. Mukasey*, 535 F.3d 243, 252 (4th Cir. 2008) (internal quotation marks omitted). Accordingly, to obtain withholding of removal, an alien must satisfy "a more demanding standard of proof than an asylum claim." *Id.* She "must establish that if she was sent back to her home country, there is a clear probability that her 'life or freedom would be threatened . . . because of [her] race, religion, nationality, membership in a particular social group, or political opinion.'" *Id.* at 252–53 (omission and alteration in original) (quoting 8 U.S.C. § 1231(b)(3)(A)); *see also* 8 C.F.R. § 1208.16(b).

8

Withholding of removal and asylum also differ with regard to the benefits granted to an alien. "[A]sylum affords [aliens] broader benefits" than a grant of withholding of removal, including the opportunity for adjustment to lawful permanent resident status, and ultimately, citizenship. *Cardoza-Fonseca*, 480 U.S. at 428 n.6. Asylees may also petition for derivative asylee status for certain family members. 8 C.F.R. § 1208.21. Moreover, while withholding of removal only prevents the removal of an alien to the specific country where she faces persecution—thereby leaving open the possibility of transfer to a third country, *id.* § 1208.16(f)—asylum prevents removal from the United States entirely. Finally, aliens granted withholding of removal are subject to a number of restrictions, including limitations on their ability to work in the United States, *id.* § 247a.12(a)(10), and to travel internationally, *id.* § 241.7.

B.

As originally enacted, the asylum provision relied on by Calla Mejia granted "an alien . . . irrespective of such alien's status," the right to apply for asylum. *See* Refugee Act of 1980, Pub. L. No. 96-212, § 208, 94 Stat. 102, 105. With the exception of a 1990 amendment that prohibited aliens convicted of an aggravated felony from applying for asylum, *see* Immigration Act of 1990, Pub. L. No. 101-649, § 515, 104 Stat. 4978, 5053, the text of the asylum provision remained largely unchanged until 1996, when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546. IIRIRA recodified the asylum provision at 8 U.S.C. § 1158 and reformatted it into two sections: § 1158(a)(1), which now provides that "[a]ny alien . . . irrespective of such alien's status, may apply for

9

asylum," and § 1158(a)(2), which enumerates certain classes of aliens who are ineligible to apply for asylum.

Specifically, as amended, the asylum provision now provides that individuals who could be removed to a "[s]afe third country," § 1158(a)(2)(A), failed to timely apply for asylum, § 1158(a)(2)(B), or were previously denied asylum, § 1158(a)(2)(C), are statutorily ineligible to apply for asylum. Section 1158(a)(2)(D), however, sets out an exception to these exceptions: Notwithstanding a previous denial of asylum, an alien may apply for asylum if the alien successfully demonstrates "the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application."

## C.

In addition to revising § 1158, IIRIRA enacted § 1231(a)(5), which governs the reinstatement of removal orders. Before IIRIRA, aliens who illegally re-entered the United States after removal were placed in the same removal proceedings as those aliens not subject to a previous removal order, affording them additional hearings before an IJ. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 34–35 (2006). Frustrated with the duplicative nature of this existing process, Congress sought to "toe[] a harder line" with "illegal reentrants," *id.*, by providing:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under [Chapter 12 of Title 8], and the alien shall be removed under the prior order at any time after the reentry.

10

8 U.S.C. § 1231(a)(5).

As such, IIRIRA enlarged the class of illegal reentrants subject to summary removal after reinstatement, "explicitly insulate[d] the[ir] removal orders from review, and generally foreclose[d] discretionary relief from the terms of the reinstated order." *Fernandez-Vargas*, 548 U.S. at 35.

To effectuate § 1231(a)(5), the Attorney General promulgated 8 C.F.R. § 241.8. Typically, under this regulation, if an immigration officer determines: (1) "the alien has been subject to a prior order of removal"; (2) "the alien is in fact [the] alien who was previously removed"; and (3) "the alien unlawfully reentered the United States," then the alien has no right to a hearing before an IJ, and shall be summarily removed under the prior order. 8 C.F.R. § 241.8(a)–(c). However, the regulation provides an exception for an alien who expresses a fear of returning to the country designated in the reinstated removal order: under 8 C.F.R. § 241.8(e), "the alien shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture." If an asylum officer concludes that the alien has a "reasonable fear of persecution or torture," the case is referred to an IJ "for full consideration of the request for withholding of removal only." 8 C.F.R. § 1208.31(e).[4] Appeal of the IJ's decision as to the request for withholding of removal lies with the Board of Immigration

---

[4] This regulation was originally promulgated as 8 C.F.R. § 208.31(e), but was recodified in 2008 at 8 C.F.R. § 1208.31(e) to reflect the transfer of functions of INS to DHS. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9834 (Feb. 28, 2003). Where applicable, we refer to the recodified regulations.

11

Appeals ("BIA"). *Id.* A separate regulation permits an individual subject to a reinstated removal order to also seek protection under the Convention Against Torture. *Id.* § 1208.16(c)(4).

### III.

Calla Mejia maintains that the statutory language of the asylum provision, § 1158(a)(1), gives her the right to apply for asylum irrespective of her status. In the alternative, Calla Mejia argues that constitutional and statutory defects in the June 2015 hearing render the underlying removal order invalid. She seeks, on either ground, adjudication of her asylum application on the merits.

### A.

### 1.

As a threshold matter, we must determine our jurisdiction over Calla Mejia's statutory claim, a question of law that we consider de novo. *Kporlor v. Holder*, 597 F.3d 222, 225 (4th Cir. 2010). The government has moved to dismiss Calla Mejia's petition, premised in part on the ground that Calla Mejia failed to administratively exhaust her asylum-eligibility claim before the IJ and BIA. In response, Calla Mejia urges that, under the existing statutory and regulatory scheme, she had no forum to litigate her asylum claim and therefore satisfactorily exhausted the remedies available to her. We agree with Calla Mejia. Specifically, we conclude that we have jurisdiction to hear Calla Mejia's petition because she had no avenue "as of right" to assert her entitlement to asylum while placed in withholding-only proceedings.

Under the INA, an alien must exhaust "all administrative remedies available to the alien *as of right*" before filing a petition for review of a final order of removal. 8 U.S.C. § 1252(d)(1) (emphasis added). "When an alien has an opportunity to raise a claim in administrative proceedings but does not do so, he fails to exhaust his administrative remedies as to that claim." *Etienne v. Lynch*, 813 F.3d 135, 138 (4th Cir. 2015). Notwithstanding this rule, we've recognized that the INA's administrative-exhaustion requirement doesn't deprive us of jurisdiction to consider in the first instance an alien's claim where "the relevant statutes and corresponding regulations [do] not provide the alien with an avenue" to lodge her challenge. *Id.* at 140 (alterations omitted) (quoting *Valdiviez-Hernandez v. Holder*, 739 F.3d 184, 187 (5th Cir. 2013)).

Our reasoning in *Etienne* is instructive. In that case, we considered whether we had jurisdiction to hear an alien's legal challenges to his removal where the alien failed to raise them in the DHS expedited removal proceedings. *Id.* at 138. The government contended that we lacked jurisdiction because the alien failed to exhaust his administrative remedies pursuant to § 1252(d)(1). *Id.* After examining DHS regulations and applicable agency forms—which "h[eld] out" to aliens in expedited removal proceedings only the opportunity to lodge factual challenges to removal—we rejected the government's argument. *Id.* at 141–42. Reasoning that "[e]xhaustion of administrative remedies means using all steps that the agency *holds out*, and doing so *properly*," we concluded that the alien wasn't required to raise his legal challenges to removal before DHS to satisfy § 1252(d)(1). *Id.* at 141 (alterations omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).

13

As an alien subject to a reinstated removal order, Calla Mejia likewise had no avenue to assert her statutory claim of entitlement to asylum before the IJ and BIA because, under existing DHS regulations, she was entitled "as of right" to seek *only* withholding of removal. *See* 8 C.F.R. §§ 241.8(e), 1208.31(e). Once an asylum officer finds that an alien has shown a reasonable fear of persecution or torture, the agency holds out to individuals subject to a reinstated order of removal a hearing before an IJ and possible appeal to the BIA "for withholding of removal *only*." *Id.* § 1208.31(e) (emphasis added).

Contrary to the view of the dissent, the mere opportunity to mention a claim in administrative proceedings is not the same as having an avenue "as of right" to do so. The dissent makes much of the fact that Calla Mejia filed before the IJ a Form I-589 Application for Asylum and asserts that the BIA could have decided the legal arguments she raised as to her entitlement. But our colleague ignores that DHS regulations expressly limit Calla Mejia from seeking anything other than withholding of removal. While the IJ and BIA could listen to Calla Mejia's statutory claim, the regulations are clear that asylum is unavailable to her in the administrative proceedings. An opinion written by the IJ and BIA to that effect—no matter how carefully considered—does not change the fact that Calla Mejia had no "avenue" to assert her entitlement to asylum in proceedings reserved for seeking withholding of removal.

Moreover, we can readily dispel the government's suggestion that administrative relief was available to Calla Mejia because the Attorney General, pursuant to 8 C.F.R. § 1003.1(h)(1), could have reviewed her case and potentially rescinded the regulation that

14

foreclosed her eligibility to apply for asylum. The regulation provides that the Attorney General may be referred a case from the BIA in only three ways: (1) if the Attorney General directs the referral; (2) if the Chairman or majority of the BIA believes the case should be referred; or (3) if the Secretary of Homeland Security directs the referral. 8 C.F.R. § 1003.1(h)(1)(i)–(iii). Calla Mejia therefore could not have triggered the Attorney General's review of her case.

Thus, because controlling DHS regulations limit individuals like Calla Mejia to seeking only "full consideration of [their] request for withholding of removal," *id.*, we conclude that Calla Mejia exhausted all administrative remedies available to her "as of right" pursuant to 8 U.S.C. § 1252(d)(1).[5] The government also contends that Calla Mejia waived her statutory claim because she withdrew her motion to apply for asylum when the IJ granted her application for withholding of removal and because she didn't appeal to the BIA. Although "[g]enerally, any claim not raised before the BIA is waived[,] . . . a claim is not waived when it would be futile to raise it." *Selgeka v. Carroll*, 184 F.3d 337, 345 (4th Cir. 1999).[6] Calla Mejia's asylum claim falls within this futility exception

---

[5] Considering the same statutory asylum-eligibility issue raised by Calla Mejia, the Ninth Circuit in *Perez-Guzman v. Lynch* rejected the government's assertion that, because the petitioner failed to put the BIA on notice of this statutory argument, he had not exhausted his administrative remedies. 835 F.3d 1066, 1073 (9th Cir. 2016). In the court's view, because "the BIA had no authority to disregard [8 C.F.R. § 1208.31(e)]," the petitioner did not need to exhaust his argument for asylum eligibility. *Perez-Guzman*, 835 F.3d at 1073. So too here.

[6] Even accepting the dissent's view that *Selgeka* doesn't mean what it says and that its futility rule applies to "forfeited" rather than "waived" claims, we cannot agree that Calla Mejia "relinquish[ed] or abandon[ed] . . . a known right." *See* Dissent Op., at (Continued)

15

because the BIA—bound to follow DHS regulations and without authority to overturn them—applies 8 C.F.R. § 1208.31(e) to preclude individuals subject to a reinstated removal order from applying for asylum. *See Orquera v. Ashcroft*, 357 F.3d 413, 424 n.8 (4th Cir. 2003) (observing that where adjudicative administrative body lacked power to invalidate an INS regulation as unconstitutional or contrary to the authorizing statute, "rais[ing] these arguments with the [adjudicative body] would have been futile" (citing *Selgeka*, 184 F.3d at 345)).

The government acknowledges that the BIA would have applied the regulation and dismissed Calla Mejia's appeal as to her asylum claim, but contends that Calla Mejia should have appealed to the BIA nonetheless. The fact remains, however, that having been granted the only remedy available to her under the statutory and regulatory scheme, any attempt by Calla Mejia to seek asylum before the BIA would have been fruitless. Moreover, doing as the government suggests would have required Calla Mejia to remain detained while awaiting the BIA's inevitable application of DHS regulations and subsequent dismissal of her appeal for asylum. We won't countenance such a pointless endeavor.

Having determined that we have jurisdiction over Calla Mejia's statutory claim for asylum, we turn to the merits.

---

13 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Calla Mejia was limited to "full consideration of the request for withholding of removal only" before the IJ and appeal to the BIA therefrom, 8 C.F.R. § 1208.31(e). She could not have abandoned a right she did not have.

16

2.

Calla Mejia's petition challenges the validity of the agency's interpretation of the reinstatement bar to preclude individuals subject to reinstated removal orders from applying for asylum. To resolve this issue of statutory construction, we apply the familiar two-step framework prescribed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45 (1984). "At *Chevron*'s first step, we examine the statute's plain language; if Congress has spoken clearly on the precise question at issue, the statutory language controls." *Ojo v. Lynch*, 813 F.3d 533, 538–39 (4th Cir. 2016) (internal quotation marks omitted). In conducting this inquiry, "we employ the traditional rules of statutory construction," by "consider[ing] the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and other relevant statutes." *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 289 (4th Cir. 2013) (alteration and internal quotation marks omitted). At step one of *Chevron* "we focus purely on statutory construction without according any weight to the agency's position." *Ojo*, 813 F.3d at 539 (internal quotation marks omitted).

If we find that "Congress has not so spoken, in that the statute is silent or ambiguous, we defer to the agency's interpretation if it is reasonable." *Id.* at 539 (internal quotation marks omitted). "We therefore will not usurp an agency's interpretive authority by supplanting its construction with our own, so long as the interpretation is not arbitrary, capricious, or manifestly contrary to the statute." *Philip Morris USA*, 736 F.3d at 290 (internal quotation marks omitted).

3.

The question whether an individual subject to a reinstated removal order is ineligible to seek asylum is one of first impression in our circuit. Six of our sister circuits have considered the question and all agree that such an individual is ineligible to apply for asylum. *See Garcia Garcia v. Sessions*, 856 F.3d 27, 31 (1st Cir. 2017); *Cazun v. Att'y Gen. U.S.*, 856 F.3d 249, 251 (3d Cir. 2017); *Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1310 (11th Cir. 2016); *Perez-Guzman*, 835 F.3d at 1070; *Ramirez-Mejia v. Lynch*, 794 F.3d 485, 491 (5th Cir. 2015), *pet'n for reh'g en banc denied*, 813 F.3d 240 (5th Cir. 2016); *Herrera-Molina v. Holder*, 597 F.3d 128, 139 (2d Cir. 2010).

Three of these circuits have held that the reinstatement bar clearly precludes an individual subject to a reinstated removal order from seeking asylum relief. *See Jimenez-Morales*, 821 F.3d at 1310 (examining § 1231(a)(5) and § 1158 and concluding that "[a]s asylum is a form of relief from removal" contained in Chapter 12 of Title 8 of the U.S. Code, an individual subject to a reinstated removal order "is not eligible for and cannot seek asylum"); *Ramirez–Mejia*, 794 F.3d at 490 (considering § 1158's "discretionary nature" and concluding that "[a]ffording asylum relief to aliens whose removal orders are reinstated would be inconsistent with [§ 1231(a)(5)]"); *Herrera-Molina*, 597 F.3d at 139 (examining the plain language of § 1231(a)(5) and DHS regulations and holding that "relief other than withholding of removal . . . is not available to this petitioner").

The remaining circuits have forged a different path. After attempting to harmonize § 1158 and § 1231(a)(5) by looking to the plain language of the provisions, employing canons of statutory construction, and reviewing the legislative history of IIRIRA, the Third and Ninth Circuits concluded that Congress had not spoken directly to

18

the instant issue. *See Cazun*, 856 F.3d at 255–59; *Perez-Guzman*, 835 F.3d at 1074–77. The First Circuit, by contrast, assumed without deciding that an ambiguity exists in the interplay of § 1158(a)(1) and § 1231(a)(5). *Garcia Garcia*, 85 F.3d at 38. These courts thus moved on to *Chevron*'s second step, and once there, found the agency's interpretation of § 1231(a)(5) to bar asylum relief to those subject to reinstated removal orders—a construction embodied in 8 C.F.R. § 1208.31(e)—to be reasonable and therefore entitled to deference. *See Garcia Garcia*, 856 F.3d at 38–41; *Cazun*, 856 F.3d at 259–61; *Perez-Guzman*, 835 F.3d at 1079–82.

There is much to commend in the view of the First, Third, and Ninth Circuits that the agency's interpretation of § 1231(a)(5) to preclude asylum relief is a reasonable one and thereby entitled to deference. But as we explain below, we discern no ambiguity in the interplay between § 1231(a)(5) and § 1158(a)(1). We think it clear that, by enacting the reinstatement bar, Congress intended to preclude individuals subject to reinstated removal orders from applying for asylum. Accordingly, we hold that Calla Mejia is ineligible to apply for asylum.

a.

In considering these statutes, our goal is to "fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Because "the plain language of the statute is the most reliable indicator of Congressional intent," we look there first. *Ojo*, 813 F.3d at 539 (alteration and internal quotation marks omitted).

19

The plain text of § 1158 and § 1231(a)(5) reveals a tension between these provisions. Section 1158(a)(1) proclaims that "[a]ny alien . . . irrespective of such alien's status, may apply for asylum." And, § 1231(a)(5) commands that an alien subject to a reinstated order of removal "may not apply for any relief under [Chapter 12 of Title 8]." At first glance, then, the broad grant of eligibility for asylum in § 1158(a)(1) seems just as absolute as the broad prohibition on relief for aliens subject to reinstated removal orders in § 1235(a)(5). And yet, neither provision is absolute.

To begin with, § 1158 is restricted by its own terms. Specifically, § 1158(a)(1)'s guarantee that "[a]ny alien" may apply for asylum is limited by § 1158(a)(2)'s clarification that there are some types of aliens who may not apply for asylum. In the same way, § 1231(a)(5)'s prohibition on applying for relief is subject to an important caveat, in that § 1231(b)(3)(A) restricts the Attorney General from removing an alien who qualifies for withholding of removal. Thus, notwithstanding the reinstatement bar's broad language, "that section does not bar *all* types of relief." *Cazun*, 856 F.3d at 264 (Hardiman, J., concurring in judgment). In other words, the text of both provisions—though at first blush absolute—allows for "interpretive flexibility." Pet'r's Br. at 26.

We therefore reject Calla Mejia's contention that the asylum statute is unambiguous in its broad application to "[*a*]*ny* alien . . . *irrespective of such alien's status*." 8 U.S.C. § 1158(a)(1) (emphasis added). Calla Mejia argues that the only exceptions to this categorical rule of eligibility appear within the closed universe of § 1158 itself, none of which apply to Calla Mejia, and that Congress therefore intended all aliens, even those subject to reinstated removal orders, to be eligible to seek asylum.

20

Calla Mejia's textual arguments—lodged as they are in a statutory vacuum—do little to assist us with our interpretative task. In support of her view that Congress spoke directly to this issue in the text of the asylum statute, Calla Mejia argues that Congress broadened the class of aliens who could seek asylum when, by enacting IIRIRA, it amended the relevant modifier contained in § 1158(a)(1)'s grant of eligibility from "an alien" to "any alien." But Calla Mejia's claim that Congress's intent is made clear because it selected for § 1158(a)(1) a word with a particularly "expansive meaning," *United States v. Gonzales*, 520 U.S. 1, 5 (1997), applies equally to § 1231(a)(5)'s bar on "any relief," selected by Congress on the same day.

Similarly unavailing is Calla Mejia's argument that § 1231(a)(5) is inapplicable to forms of relief that do not explicitly reference the reinstatement bar. In her view, if Congress truly intended to exempt individuals subject to reinstated removal orders from § 1158(a)(1)'s broad reach, it would have done so by including within § 1158 an explicit cross-reference to § 1231(a)(5). But, as the government points out, if the reinstatement bar applied only to those types of relief amended to cross-reference § 1231(a)(5), then the reinstatement bar would be rendered superfluous "because Congress did not [so] specifically amend any of the relief provisions under Chapter 12 of Title 8." Gov't's Br. at 31. Moreover, Calla Mejia's favored construction would directly contravene the Supreme Court's recognition that § 1231(a)(5) bars an alien subject to a reinstated removal order from applying for adjustment of status, notwithstanding the fact that the adjustment-of-status provision, 8 U.S.C. § 1255, contains no reference to the reinstatement bar. *See Fernandez-Vargas*, 548 U.S. at 35.

21

But we also don't agree with the government that the plain text of § 1231(a)(5) resolves this issue. According to the government, § 1231(a)(5) could not more plainly state that an alien subject to a reinstated removal order "is not eligible and may not apply for any relief under" Chapter 12 of Title 8, wherein the asylum statute can be found. Thus, because asylum is clearly a "form of relief under this chapter" to which the reinstatement bar applies, the government says we're bound to give effect to Congress's unambiguous intent. But, as with Calla Mejia's textual arguments, the government's argument falls short because it too fails to square the reinstatement bar's prohibition on seeking "any relief" with the broad grant of eligibility in the asylum provision.

Accordingly, we turn to canons of statutory construction to harmonize these provisions.[7] *Chevron*, 467 U.S. at 843 n.9 (instructing courts to employ traditional tools of statutory construction to ascertain Congress's clear intent). "As a rule of statutory construction, . . . the specific terms of a statutory scheme govern the general ones." *D.B. v. Cardall*, 826 F.3d 721, 735 (4th Cir. 2016) (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012)). This rule is "particularly applicable where 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions,' as it has done in the immigration context." *Id.* (quoting *RadLAX*, 132 S. Ct. at 2071).

---

[7] The government proposes that the "later-enacted" § 1231(a)(5) should prevail over § 1158. But this tie-breaker is unavailable to us because both provisions were codified simultaneously in IIRIRA.

22

Though it is admittedly "[s]ometimes . . . difficult to determine whether a provision is a general or a specific one," we conclude that the reinstatement bar is more specific than the asylum provision and therefore controls our statutory inquiry. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 187 (2012). We apply the general-specific rule of construction "to statutes in which a general permission . . . is contradicted by a specific prohibition." *D.B.*, 826 F.3d at 735 (internal quotation marks omitted). These provisions readily fall within these categories: § 1158(a)(1) contains a general permission—allowing "[a]ny alien" to apply for asylum—that is contradicted by § 1231(a)(5)'s specific prohibition—forbidding individuals subject to reinstated orders of removal from seeking relief. Thus, "in order to 'eliminate the contradiction,'" we construe § 1231(a)(5) to serve as a specific exception to § 1158(a)(1)'s general grant of eligibility to apply for asylum. *D.B.*, 826 F.3d at 736 (quoting *RadLAX*, 132 S. Ct. at 2071).

Calla Mejia's argument that § 1158(a)(1) is the specific provision to which the general provision of § 1231(a)(5) must yield incorrectly frames the inquiry. She urges that the reinstatement bar only generally forbids an individual subject to a reinstated removal order from applying for "any relief," § 1231(a)(5), while the asylum statute deals with one specific form of relief from removal: asylum. But the question we must resolve is not *what* type of relief is available; instead, the antecedent question is *who* is entitled to apply for that relief. The reinstatement bar "comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence." Scalia & Garner, *supra*, at 183.

23

Stated differently, the asylum provision lays out general (and qualified) terms of eligibility for asylum. This grant of permission presupposes that the recipient of the grant—the alien—is amenable to regulation. The reinstatement bar, on the other hand, deals with one specific subset of those recipients—aliens subject to reinstated removal orders—and attaches to this subset a categorical exemption from all forms of relief found in Chapter 12 of Title 8 of the U.S. Code, including asylum. In our view, a law that attaches a categorical prohibition on a specific subset of aliens is most sensibly read to control when it conflicts with the law that grants permission.

Classifying the reinstatement bar as a specific exception to § 1158(a)(1)'s general grant of eligibility more effectively harmonizes the provisions than Calla Mejia's proposed method. As an alternative to her invocation of the general-specific canon, Calla Mejia asks us to narrowly construe the undefined term of "relief" in § 1231(a)(5) so as to "[encompass] ordinary waivers of the deportation rules," such as voluntary departure, adjustment of status, and cancellation of removal, "but exclud[e] forms of redress that amount to humanitarian protection—asylum, withholding of removal, and [Convention Against Torture] protection." Pet'r's Br. at 27 (emphasis omitted). Putting aside the question of whether withholding of removal and protection under the Convention Against Torture are properly categorized as "protection" or "relief," we think it beyond doubt that asylum is a form of "relief." *E.g.*, *United States v. Denedo*, 556 U.S. 904, 909 (2009) (defining the "familiar meaning" of "relief" as "any 'redress or benefit' provided by a

court" (quoting *Black's Law Dictionary* 1317 (8th ed. 2004)).[8] Calla Mejia's proposed construction would impermissibly override Congress's intention to limit the types of relief available to aliens who illegally re-enter the United States after removal.

By enacting § 1231(a)(5), Congress sought to crack down on aliens who illegally re-enter the United States after removal by "enlarg[ing] the class of illegal reentrants whose orders may be reinstated and limit[ing] the possible relief from a removal order available to them." *Fernandez-Vargas*, 548 U.S. at 33. That withholding of removal and protection under the Convention Against Torture remain available to Calla Mejia does not, as she suggests, require us to ignore Congress's intent to bar her from applying for any relief, including asylum. Instead, we must give effect to both statutes, and construing § 1231(a)(5) to create a specific exception to § 1158(a)(1)'s general grant of eligibility to seek asylum accomplishes this goal.

To be sure, as Calla Mejia notes, Congress sought to ensure the availability of asylum to those aliens fleeing persecution. *See, e.g.*, H.R. Rep. No. 104-469, pt. 1, at 13 (1996) (discussing IIRIRA's revisions to procedures for removal and noting "[t]hroughout the process, the procedures protect those aliens who present credible claims for asylum by giving them an opportunity for a full hearing on their claims"). But Congress also sought to streamline the removal process for illegal re-entrants and to attach consequences to re-entry, including by restricting the forms of relief available to

---

[8] We note also that asylum differs from withholding of removal and protection under the Convention Against Torture in important ways. Specifically, entitlement to asylum requires less proof, is discretionary, and grants broader benefits to an alien.

those who re-enter following removal. *See, e.g.*, *id.* at 155 ("[T]he ability to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border."). In light of this statutory purpose, we reject Calla Mejia's view that Congress's desire to make asylum available to aliens as a general matter overrides Congress's intention to single out illegal re-entrants and bar them from seeking certain forms of relief.

In sum, we conclude that the interplay between § 1231(a)(5) and § 1158 is unambiguous: Congress intended that aliens subject to reinstated orders of removal be precluded from applying for asylum.[9]

b.

Calla Mejia's remaining argument, premised on international law, is also unpersuasive. She says that barring illegal re-entrants from applying for asylum violates the *Charming Betsy* canon of interpretation—which requires courts to "construe . . . statute[s] consistent with our obligations under international law," *Kofa v. INS*, 60 F.3d 1084, 1090 (4th Cir. 1995) (en banc) (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804))—because it breaches our obligations under the 1967 United

---

[9] As a result, contrary to Calla Mejia's assertion, the rule of lenity—which in the immigration context "stands for the proposition that ambiguities in deportation statutes should be construed in favor of the noncitizen," *Espinal-Andrades v. Holder*, 777 F.3d 163, 170 (4th Cir. 2015)—has no role to play. *See Hernandez v. Holder*, 783 F.3d 189, 196 (4th Cir. 2015) ("[B]ecause the rule of lenity is a last resort, not a primary tool of construction . . . it applies only where there is a grievous ambiguity or uncertainty in the statute.") (internal citations, quotation marks, and alterations omitted).

Nations Protocol Relating to the Status of Refugees.[10]  Specifically, Calla Mejia points to

Article 31(1) of the Protocol, which provides that signatories "shall not impose penalties,

on account of [an applicant's] illegal entry or presence."  Protocol Relating to the Status

of Refugees, art. 31(1), Jan. 31, 1967, 19 U.S.T. 6223.  Calla Mejia claims that

§ 1231(a)(5)'s limitation on asylum constitutes such an impermissible "penalty" for those

who illegally re-enter the United States after removal.  The government counters that the

United States' obligations under the Protocol do not extend so far as to "afford all aliens

repeated opportunities to apply for asylum, each and every time they enter the United

States illegally."  Gov't's Br. at 37–38.

We think the government has the better of this argument.  Calla Mejia offers no

support for her contention that denying illegal re-entrants the ability to apply for asylum

constitutes a "penalty," a key term undefined by the Protocol.  And the Supreme Court

has emphasized that asylum is a "discretionary mechanism" that corresponds to a

"precatory" provision of the Protocol.  *Cardoza–Fonseca*, 480 U.S. at 441.  We therefore

perceive no basis for concluding that depriving aliens, upon illegal re-entry, additional

opportunities to apply for discretionary relief constitutes a "penalty."

Crucially, the opportunity to apply for withholding of removal and Convention

Against Torture protection remains available to aliens notwithstanding a reinstated

removal order.  It could be that "[i]f withholding of removal and [Convention Against

---

[10] The United States acceded to the Protocol, which incorporated the United Nations Convention Relating to the Status of Refugees, in 1968. *INS v. Stevic*, 467 U.S. 407, 416 (1984).  "The Protocol bound parties to comply with the substantive provisions of Articles 2 through 34" of the Convention. *Id.*

Torture] protection were also eliminated for aliens who illegally reentered," Calla Mejia's argument would win the day. *Ramirez-Mejia*, 813 F.3d at 241. But, "Congress did not go so far," and we therefore agree with our sister circuits that barring illegal re-entrants from applying for asylum doesn't conflict with our international treaty obligations. *Id.*; *see also Garcia Garcia*, 856 F.3d at 41–42 (no conflict with Articles 28 or 34 of the U.N. Protocol); *Cazun*, 856 F.3d at 257 n.16 (no conflict with Articles 28, 31(1), or 34 of the U.N. Protocol).

## B.

Calla Mejia alternatively seeks to apply for asylum on the ground that her reinstated order of removal is invalid because it relies on a removal order that was entered in violation of her statutory and due process rights. To this end, Calla Mejia alleges that at the June 2015 hearing, the IJ: (1) failed to sufficiently inform her that she was eligible for asylum or that she could apply for asylum, and discouraged her from doing so; (2) failed to sufficiently advise her of the right to appeal; and (3) failed to inform her that she was eligible for pre-conclusion voluntary departure under 8 U.S.C. § 1229c(a)(1). Because we find that Calla Mejia's petition was not timely filed as to the underlying order of removal—which became final on June 10, 2015—we lack jurisdiction to address Calla Mejia's objections to the June 2015 hearing.[11]

---

[11] In so holding, we do not evaluate the manner in which the IJ conducted the June 2015 "rights presentation" to the asylum applicants. We note, however, that a discussion of an asylum applicant's credibility is incomplete without reference to the uniform view among the circuit courts of appeals, including ours, that initial "border" interviews "should be carefully scrutinized for reliability before being utilized by the fact-finder to (Continued)

Ordinarily, under 8 U.S.C. § 1231(a)(5), after DHS makes the findings necessary for reinstatement, "the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." Calla Mejia seeks to avoid this broad limitation by relying on the jurisdictional provision of The REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231. Codified at 8 U.S.C. § 1252(a)(2)(D), this provision states that notwithstanding "any other provision of this chapter (other than this section) which limits or eliminates judicial review," courts of appeals retain jurisdiction to resolve "constitutional claims or questions of law raised upon a petition for review filed . . . in accordance with this section."

The jurisdictional limitation of § 1231(a)(5) clearly falls outside the scope of § 1252: It appears in a different section of Title 8, Chapter 12, and is therefore overridden by § 1252(a)(2)(D). Accordingly, we agree with Calla Mejia that § 1231(a)(5) doesn't deprive us of jurisdiction to review the constitutional claims and questions of law that arise from an underlying removal order in the reinstatement context. *See, e.g.*, *Villegas de la Paz v. Holder*, 640 F.3d 650, 656 (6th Cir. 2010) ("[Section] 1252(a)(2)(D) re-vests the circuit courts with jurisdiction over constitutional claims or questions of law raised in the context of reinstatement proceedings."); *Lorenzo v. Mukasey*, 508 F.3d 1278, 1281 (10th Cir. 2007) ("[W]e may no longer categorically hold that we lack jurisdiction to review constitutional and statutory claims related to *all* underlying removal orders.").

---

evaluate an applicant's credibility." *Qing Hua Lin v. Holder*, 736 F.3d 343, 355 (4th Cir. 2013) (Thacker, J., concurring) (collecting cases).

However, our jurisdictional inquiry doesn't end here. While the REAL ID Act gives us jurisdiction to review Calla Mejia's constitutional and legal challenges to the underlying June 2015 removal order, her petition must still be "filed . . . in accordance with [§ 1252]." 8 U.S.C. § 1252(a)(2)(D). As the government notes, § 1252(b)(1) requires that the petition "be filed not later than 30 days after the date of the final order of removal." Calla Mejia doesn't argue otherwise, but instead asserts that to give the "jurisdiction-restoring provision" of § 1252(a)(2)(D) any "real effect," we must construe § 1252(b)(1)'s deadline to refer to the date on which the *reinstated* order of removal—not the original order—becomes final. Pet'r's Opp'n to Resp't's Mot. to Dismiss, at 16. Under Calla Mejia's favored construction, because her reinstated order of removal became final 30 days before she filed the instant petition, we have jurisdiction.

In light of the plain text and purpose of § 1251(b)(1), we reject Calla Mejia's reading and hold that the 30-day deadline runs from the date an *original* order of removal becomes final. And, as we've recognized, the 30-day time limit of § 1252(b)(1) constrains our review of an underlying order of removal, even where an alien raises constitutional or legal challenges. *See Galicia-Vargas v. Holder*, 586 F. App'x 119, 120 (4th Cir. 2014) (citing § 1252(b)(1) and finding no jurisdiction to review alien's challenges to underlying 1998 removal order because his "petition for review is not timely *as to the underlying order of removal*" (emphasis added)). We reaffirm that holding today.

To accept Calla Mejia's argument "would defeat the purpose of the statute's time bar by allowing a challenge to an underlying removal order any time a reinstated order is

30

issued." *Verde-Rodriguez v. Att'y Gen. U.S.*, 734 F.3d 198, 203 (3d Cir. 2013).

Congress was clear when it enacted the REAL ID Act that the intended "overall effect of the proposed reforms" in the Act—including the jurisdictional provision of § 1251(a)(2)(D)—was "to give every alien a fair opportunity to obtain judicial review while restoring order and common sense to the judicial review process." H.R. Rep. 109-72, at 174 (2005) (Conf. Rep.), *as reprinted in* 2005 U.S.C.C.A.N. 240, 299. Central to this goal of "order and common sense" was Congress's desire that aliens "not be able to ignore the thirty-day time limit on seeking review." *Id.*

Calla Mejia warns that our interpretation of § 1252(b)(1) contravenes the REAL ID Act and effectively "abolish[es] review of *all* underlying orders in reinstatement," thereby raising "'serious constitutional problems'"—namely, Suspension Clause concerns.[12] Pet'r's Opp'n to Resp't's Mot. to Dismiss, at 12, 17 (quoting *INS v. St. Cyr*, 533 U.S. 289, 300 (2001)). Not so. Rather, we think it more than feasible that an individual removed to her home country could illegally re-enter the United States, have the original removal order reinstated by DHS, and petition for review—all within a month's time.

Moreover, given that an alien may move to reopen her removal proceedings pursuant to 8 U.S.C. § 1229a(c)(7), we find Calla Mejia's concerns unavailing. *See Luna v. Holder*, 637 F.3d 85, 87 (2d Cir. 2011) (describing § 1229a(c)(7)'s motion to reopen

---

[12] *See* U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").

process as "an adequate and effective substitute for habeas review" that resolves Suspension Clause concerns raised by § 1252(b)(1)'s 30-day deadline). In this case, Calla Mejia could have moved to reopen her removal proceedings, providing via affidavit or other evidence the material facts to be considered. *See* 8 C.F.R. §1003.2(c). And Calla Mejia could have sought such relief even after she was removed to Peru, *William v. Gonzales*, 499 F.3d 329, 333 (4th Cir. 2007), and had ninety days after the removal order became final to do so, 8 U.S.C. § 1229a(c)(7)(C)(i). Moreover, even if Calla Mejia failed to file the motion within the statutory time limit, she could still seek to equitably toll the deadline. *Kuusk v. Holder*, 732 F.3d 302, 305 (4th Cir. 2013). Given the avenues available to an alien subject to a reinstated removal order to seek judicial review of the underlying removal order, we cannot agree with Calla Mejia that the government's proposed construction of § 1252(b)(1)—which we now adopt—renders the REAL ID Act "toothless."

Thus, because Calla Mejia did not timely file her challenge to the June 2015 order of removal, we lack jurisdiction to review her claims.

*PETITION FOR REVIEW DISMISSED*
*IN PART AND DENIED IN PART*

32

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

Calla Mejia was in front of the immigration judge with her lawyer. She made a motion for asylum. The judge was ready to rule. However, Calla Mejia opted instead to withdraw her motion for asylum and to waive her right to appeal the asylum issue. The immigration judge therefore did not rule on the asylum issue. No appeal was taken to the BIA. Yet somehow we are now ruling on the asylum issue that Calla Mejia raised and abandoned. We have no jurisdiction to do so and I dissent.

I.

*Calla Mejia's First Illegal Entry Into the United States*

Calla Mejia first illegally entered the United States in April 2015, crossing the Rio Grande near Laredo, Texas. She was immediately apprehended and questioned by a border patrol agent. When asked why she entered the United States, Calla Mejia told the agent she wished "to reside and work in New York, New York," J.A. 217, and denied that she would "be harmed or face persecution" if she returned to Peru, J.A. 218. The agent determined that Calla Mejia was inadmissible and placed her, initially, in expedited removal proceedings. *See* 8 U.S.C. § 1225(b)(1). After she had been detained for some period of time, however, Calla Mejia expressed a fear that she would be harmed if she were returned to Peru. Therefore, an Asylum Officer ("AO") conducted a credible-fear interview. *See* 8 U.S.C. § 1225(b)(1)(A). During the interview, Calla Mejia indicated that she was afraid to return to Peru because her husband routinely abused her physically and even threatened her with death. Calla Mejia claimed that she reported this abuse to the police, but that they took no action because her husband was a police officer. She

33

also claimed that she could not avoid her husband's abuse by relocating to a different part of Peru—she believed that his position as a police officer would enable him to find her. When asked why she initially told the Border Patrol agents that she "did not fear returning to Peru," Calla Mejia responded that she did, in fact, tell the Border Patrol agents that she feared returning to Peru, but that the agents stated they "[did not] care." J.A. 214. Following this interview, the AO concluded that Calla Mejia had a credible fear of persecution in Peru on account of her membership in a particular social group, *see* 8 U.S.C. § 1225(b)(1)(B)(ii), and referred her for a full removal proceeding during which she could seek relief from removal, *see* 8 U.S.C. § 1229a.

DHS issued Calla Mejia a Notice to Appear, charging that she was removable as an immigrant who did not possess a valid entry document "at the time of application for admission." 8 U.S.C. § 1182(a)(7)(A)(i)(I). On June 10, 2015, Calla Mejia appeared pro se at a Master Calendar hearing before an immigration judge "to determine whether or not those facts and allegations [in the Notice to Appear] are true and correct." J.A. 545.

The Immigration Judge offered Calla Mejia an opportunity to consult an attorney before continuing with the removal proceedings, but Calla Mejia declined and indicated she wanted to proceed on her own. Calla Mejia admitted the allegations set forth in the Notice to Appear and conceded that she had entered the United States "illegally." J.A. 561. After the immigration judge determined that Calla Mejia was removable, Calla Mejia identified Peru as her preferred country of removal.

Calla Mejia did not apply for relief from removal and waived any appeal from the proceedings. The immigration judge asked if there was "any reason [she could] not

34

return to Peru," and Calla Mejia stated that she "told the officer [she] was fearful [of] returning to [her] country." *Id.* The immigration judge noted that Calla Mejia would have a serious "credibility problem" because she had "told the first officer [she was] going to live in New York for five years and [she was] not afraid to return." J.A. 562. Nonetheless, the judge indicated that if Calla Mejia wanted to apply for asylum, withholding of removal and protection under the Convention Against Torture, the court would "allow it." *Id.* Calla Mejia stated that she did not wish to apply for relief from removal, that she understood the order of removal was final, and that she did not wish to appeal.

The immigration judge entered a final order of removal on June 10, 2015. Before executing the order of removal, DHS issued to Calla Mejia a standard Form I-294 Warning to Alien Ordered Removed or Deported, which admonished her that she was "prohibited from entering, attempting to enter, or being in the United States" "[f]or a period of 10 years from the date of [her] departure from the United States." J.A. 13. Additionally, the Form I-294 issued to Calla Mejia provided, in bold font, the following:

> **WARNING: Title 8 United States Code, Section 1326 provides that it is a crime for an alien who has been removed from the United States to enter, attempt to enter, or be found in the United States during the period in which he or she is barred from so doing without the Attorney General's consent. Any alien who violates this section of law is subject to prosecution for a felony. Depending on the circumstances of the removal, conviction could result in a sentence of imprisonment for a period of from 2 to 20 years and/or a fine of up to $250,000.**

J.A. 13. Calla Mejia was removed to Peru on June 22, 2015.

*Calla Mejia's Second Illegal Entry and DHS's
Reinstatement of the Prior Order of Removal*

Calla Mejia waited for about two months before illegally crossing the Mexican border into the United States for a second time. On August 19, 2015, she was apprehended by border patrol agents near Laredo, Texas, once again. On August 21, 2015, DHS served Calla Mejia with a Form I-871 indicating that because she had unlawfully reentered the United States after having been previously removed, she was subject to removal by reinstatement of her prior order of removal pursuant to section 241(a)(5) of the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1231(a)(5). Calla Mejia signed an acknowledgement indicating that she did "not wish to make a statement contesting [the] determination" that she was removable. J.A. 201. DHS thus issued an order on August 21, 2015, concluding that Calla Mejia was "subject to removal through reinstatement of the [June 10, 2015, order of removal], in accordance with [8 U.S.C. § 1231(a)(5)]." J.A. 201.

Before DHS could execute the reinstated order of removal, however, Calla Mejia again expressed a fear of returning to Peru. DHS therefore referred her to a USCIS AO for a reasonable-fear interview "to determine whether [she] should be referred to an immigration judge to apply for withholding or deferral of removal." J.A. 178. The AO informed Calla Mejia that she had "the right to have an attorney or representative present," but Calla Mejia declined legal representation and asked to "[p]roceed" with the interview. J.A. 177. Calla Mejia then told the AO about physical and mental abuse she suffered at the hands of her husband, and about her inability to seek protection from the authorities because of her husband's employment as a police officer. She believed that if she ever returned to Peru, her husband would find her, "[m]istreat [her], hit [her], even

36

kill [her]." J.A. 193. The AO determined that the interview testimony by Calla Mejia "established that there is a reasonable possibility of suffering harm constituting persecution in the country to which [she] has been ordered removed . . . on account of . . . membership in a particular social group." J.A. 176. Accordingly, the proceedings against Calla Mejia were referred to an immigration judge "for a determination in accordance with 8 CFR § 208.31(e)." J.A. 595.

*Calla Mejia's Application for Asylum*

Calla Mejia obtained counsel and filed a Form I-589 Application for Asylum and for Withholding of Removal. Because she had been placed in withholding-only proceedings, Calla Mejia also submitted a formal written motion setting forth her reasons for believing that she was eligible for asylum. Specifically, Calla Mejia asserted that her original order of removal was invalid because she had not been given a genuine chance to apply for relief. And because she "did not meaningfully waive her rights to seek asylum or pursue an appeal during her first removal proceedings," she argued that she remained eligible for asylum in the present proceedings. Calla Mejia also contended that "the relevant provisions of the [INA] do not preclude an individual subject to a reinstatement of removal order from applying for asylum." J.A. 134.

At the merits hearing, before taking testimony as to Calla Mejia's claim for withholding of removal, the immigration judge addressed her application for asylum, stating that she was "inclined to conclude that [Calla Mejia was] not eligible for asylum." J.A. 13. The immigration judge offered to "flesh" out her reasoning on the asylum issue "in a written decision," but noted that would "take some more time." J.A. 13. Calla

37

Mejia responded through counsel that she had been in detention for "almost six months" and was "adamant" about getting released from custody as soon as possible. J.A. 15. Calla Mejia therefore "opt[ed] just for the withholding only proceeding," J.A. 14-15, and indicated that if the immigration judge granted her withholding claim, she would "withdraw" the asylum application and "waive any appeal of the asylum issue," J.A. 16.

Following Calla Mejia's testimony, the immigration judge found that "she [met] all of the requirements for withholding under the INA." J.A. 40. The judge informed Calla Mejia that if she wanted to pursue her asylum claim, "for the record . . . I would certainly want to do a . . . thorough decision on that and issue a written decision," which Calla Mejia could appeal. J.A. 41. The immigration judge then explained that she would "do a very short decision orally granting . . . withholding of removal," and that if Calla Mejia "waive[d] appeal, [the oral decision] would be a final order." J.A. 44. However, the immigration judge indicated that if Calla Mejia wished to pursue the asylum claim, the court would not issue a decision until later in a written order. Beyond any doubt the immigration judge was willing and able to issue a ruling on Calla Mejia's claim for asylum.

At this point, Calla Mejia indicated that she would "rather have the decision now" and unequivocally stated that she was "withdraw[ing] that [asylum claim] for the oral decision today," so as to obtain her release from detention. J.A 45. The immigration judge then ruled, granting Calla Mejia's "application for withholding of removal under the INA." J.A. 46. Counsel confirmed that Calla Mejia was waiving appeal of the immigration judge's order, and DHS likewise waived appeal. On February 17, 2016, the

38

immigration judge entered an order granting Calla Mejia's claim for withholding of removal under the INA. There this case should have ended.

*Calla Mejia's Petition for Review*

A month later, however, on March 17, 2016, Calla Mejia filed this petition for review in our court, asserting the very claim she raised and then withdrew during proceedings before the immigration judge—that she had the right to raise an asylum claim before the immigration judge even though she was subject to a reinstated order of removal.[1] Calla Mejia based this contention on the plain language of the INA, which provides that "[a]ny alien" may apply for asylum "irrespective of such alien's status." 8 U.S.C. § 1158(a)(1). According to Calla Mejia, "DHS wrongfully *denied [her] the chance* to apply for asylum." Brief of Appellant at 17 (emphasis added). And she now seeks an order from this court sending her asylum issue back to an immigration judge where she was before.

The Attorney General responded by filing a motion to dismiss the petition for review for lack of jurisdiction. The Attorney General argued that Calla Mejia failed to exhaust her asylum claim before the immigration judge or the BIA, having "filed a motion requesting asylum," but having withdrawn that motion "at the conclusion of her proceedings in Immigration Court." Respondent's Motion To Dismiss at 8. Noting that

---

[1] Technically, Calla Mejia did not petition for review of the February 17, 2016, order. Instead, Calla Mejia filed a petition for review of the August 21, 2015, decision to reinstate the prior order of removal, asserting that the reinstated order of removal became final at the conclusion at the withholding-only proceedings. The government does not argue to the contrary.

39

Calla Mejia "also expressly waived appeal to the [BIA] and filed no such appeal," the Attorney General asserted that "there is no decision from the Immigration Judge or the [BIA] regarding Petitioner's asylum arguments" for this court to review. *Id.*

Calla Mejia filed a memorandum in opposition to the motion to dismiss. Relying on *Etienne v. Lynch*, 813 F.3d 135 (4th Cir. 2015), she argued that "[u]nder current agency regulations, . . . Calla Mejia had no right to seek asylum from either an immigration judge or the BIA," and that the exhaustion rule therefore did not preclude her from raising an asylum claim in her petition for review to this court. Petitioner's Opposition to Motion to Dismiss at 6.

Finally, in reply, the Attorney General emphasized that Calla Mejia "had an opportunity to file an appeal to the Board of Immigration Appeals raising her current legal claims, but failed to avail herself of that opportunity." Respondent's Reply to Opposition to Motion to Dismiss at 1 (citing 8 C.F.R. § 1208.31(e)). In responding to Calla Mejia's argument that the "agency afforded her no avenue for appeal" with regard to her asylum claim, the Attorney General contended that this ignored both "the extensive colloquy before the Immigration Judge prior to her waiver of her appeal rights," and "the regulation at 8 C.F.R. § 1208.31(e), which, specifically authorized an appeal to the Board." *Id.* at 2; *see* 8 C.F.R. § 1208.31(e) ("Appeal of the immigration judge's decision shall lie to the Board of Immigration Appeals."). The Attorney General argued that Calla Mejia's belief that the BIA "was going to rule against her [did] not relieve her of the obligation to exhaust her administrative remedies by filing an appeal with the [BIA]." *Id.* at 6.

## II.

According to the majority, Calla Mejia may now escape the consequences of her considered and strategic decision to withdraw her claim for asylum and waive any appeal of that issue because, in its view, Calla Mejia had no forum to litigate her asylum claim and because the immigration judge and the BIA would have likely ruled against her. For the reasons discussed below, I cannot agree with the majority's decision to allow Calla Mejia to make an end run around the administrative tribunal, and to its willingness to excuse Calla Mejia from her counseled choices and the representations she made to the immigration judge. I would dismiss Calla Mejia's petition for review in its entirety for lack of jurisdiction, and I would not reach the merits of the asylum claim.

### A. *Exhaustion*

An alien must exhaust "all administrative remedies available to the alien as of right" before filing a petition for review of a final order of removal. 8 U.S.C. § 1252(d)(1). An alien who fails to raise a particular claim before the BIA fails to exhaust that claim. *See Tiscareno-Garcia v. Holder*, 780 F.3d 205, 210 (4th Cir. 2015). This court lacks jurisdiction to review any claim that is not administratively exhausted. *See id;* 8 U.S.C. § 1252(d)(1).

This court has excused the exhaustion requirement for due process claims because the BIA generally has *no authority to address or remedy* such constitutional claims. *See Farrokhi v. INS*, 900 F.2d 697, 700-01 (4th Cir. 1990). When the constitutional claims concern procedural errors that may be addressed and remedied by the BIA, however, exhaustion is still required. *See Kurfees v. INS*, 275 F.3d 332, 337 (4th Cir. 2001). As

41

my colleagues rightly observe, we excused the exhaustion requirement in *Etienne v. Lynch*, 813 F.3d 135, 138 (4th Cir. 2015). There, we explained that "in expedited removal proceedings, an alien has *no opportunity* to challenge the legal basis of his removal," and thus need not satisfy the exhaustion requirement. *Id.* at 138 (emphasis added). Stated differently, the alien there was not provided "with an avenue to challenge the legal conclusion" that he was subject to expedited removal. *Id.* at 140 (internal quotation marks omitted).

This case is not like *Etienne*. First, the BIA has the authority to decide the legal argument raised by Calla Mejia—that "the relevant provisions of the [INA] do not preclude an individual subject to a reinstatement of removal order from applying for asylum," J.A. 134, and that "[t]o the extent that 8 C.F.R. § 208.31(e) allows withholding of removal only, this regulation conflicts with controlling statutory authority," J.A. 135 (internal quotation marks omitted). By contrast, *Etienne* involved expedited removal proceedings, over which a DHS officer—who need not be an attorney or have any specialized legal training—presides. *See Etienne,* 813 F.3d at 139. Unlike an immigration judge, a DHS officer is typically not qualified to address questions of law such as whether an alien is an "aggravated felon" subject to expedited removal proceedings. Furthermore, "aliens subject to expedited removal [not only] do not appear before an IJ" but "they cannot appeal an adverse decision to the BIA." *Valdiviez-Hernandez v. Holder*, 739 F.3d 184, 187 (5th Cir. 2013). Thus, with a claim that the hearing officer could not address and that could not be appealed to the BIA, Etienne had

42

no "avenue to challenge the legal conclusion" that he was subject to expedited removal proceedings. *Etienne*, 813 F.3d at 140 (internal quotation marks omitted).

In contrast, Calla Mejia not only had an opportunity to raise her asylum claim, but she in fact filed a Form I-589 Application for Asylum. The immigration judge had the claim before her and the authority to decide whether Calla Mejia could apply for asylum in light of the relevant statutes and regulations. And the immigration judge repeatedly assured Calla Mejia that she would consider the issue carefully in a written opinion from which an appeal to the BIA could be taken. However, the immigration judge also gave Calla Mejia a choice: either an oral decision granting withholding of removal to be entered immediately, or a written decision addressing the asylum claim to be entered later. Calla Mejia affirmatively withdrew her asylum claim so as not to delay the entry of the order granting withholding and her release from detention.

Calla Mejia now asks us to consider an asylum claim that has not been ruled upon by the immigration judge or presented to the BIA. To the extent she contends that the exhaustion requirement should be excused because it would have been futile to present her claim to the BIA in view of the agency's longstanding practice of affording withholding-only proceedings in accordance with its own regulation, I cannot agree. Congress "expressly requires exhaustion of administrative remedies." *Temu v. Holder*, 740 F.3d 887, 899 n.4 (4th Cir. 2014) (Agee, J., dissenting); *see* 8 U.S.C. § 1252(d)(1) (requiring exhaustion of remedies). Accordingly, courts must "strictly enforce[]" this requirement. *Temu*, 740 F.3d at 899 n.4 (Agee, J., dissenting). Where "Congress has mandated exhaustion," the statutory exhaustion requirement "is at odds with traditional

43

doctrines of administrative exhaustion, under which a litigant . . . need not exhaust where doing so would otherwise be futile." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). The INA requires exhaustion "irrespective of the forms of relief sought and offered through administrative avenues," and it is improper to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Id.*

*Booth* does state that exhaustion may not be required "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Id.* at 736. But to the extent a futility-like exception to the exhaustion rule survived *Booth*, it is extremely narrow, *see*, *e.g., United States v. Copeland*, 376 F.3d 61, 66-67 (2d Cir. 2004), and does not apply here. *Booth* concluded that an inmate's claim for monetary relief had to be exhausted even though the prison's internal grievance procedure had no provision for the recovery of money damages. Under *Booth*, a remedy is available as of right where "the administrative process has authority to take some action in response to a complaint, but not the remedial action [the complainant] demands." *Booth*, 532 U.S. at 736. Such was the case here.

Before bringing her asylum eligibility claim to this court, Calla Mejia should have presented it to the BIA, despite the long odds of success, for it to consider anew.

## B. *Waiver*

Finally, even assuming that futility could, in some instances, excuse a failure to exhaust, the merits of Calla Mejia's argument are still not properly before us. As the government contends, Calla Mejia did not merely fail to raise the asylum question, she raised the issue and then intentionally and affirmatively withdrew it and explicitly gave

44

up the right to appeal to the BIA. Calla Mejia thus did not simply *forfeit* the issue, she *waived* the issue, which extinguishes any claim of error and leaves us with nothing to review. *See United States v. Olano*, 507 U.S. 725, 733 (1993) (noting that "forfeiture is the failure to make the timely assertion of a right," while "waiver is the intentional relinquishment or abandonment of a known right," and explaining that issues that are waived are not reviewable at all, because waiver "extinguish[es]" any error (internal quotation marks omitted)); *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) ("[W]hen a claim is waived, it is not reviewable on appeal, even for plain error. Rather, a valid waiver means that there was no error at all. . . . A party who identifies an issue, and then explicitly withdraws it, has waived the issue." (internal citation and quotation marks omitted)).

Relying on *Selgeka v. Carroll*, 184 F.3d 337 (4th Cir. 1999), the majority contends that there is no waiver here, because it would have been futile for Calla Mejia to raise the asylum issue. *See* Majority Op. at 15-16. I believe the majority misreads *Selgeka*. Although the court in *Selgeka* stated that "a claim is not waived when it would be futile to raise it," 184 F.3d at 345, courts have frequently been inexact in their usage of the terms "waiver" and "forfeiture." *See Freytag v. Com'r*, 501 U.S. 868, 894 n.2 (1991) (noting that the Supreme Court has "so often used [waiver and forfeiture] interchangeably that it may be too late to introduce precision") (Scalia, J., concurring); *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.,* 369 F.3d 385, 395 n.7 (4th Cir. 2004) (en banc) (noting that "[w]hile cases often use the terms 'forfeit' and 'waive' interchangeably, there is an important distinction"). Given that the facts of *Selgeka* involved a simple failure to

45

raise an issue and the court's statement that "[n]othing in the record suggests that Selgeka made a knowing and intelligent decision to waive his due process claim," *Selgeka*, 184 F.3d at 345, I think *Selgeka*'s statement that "a claim is not waived when it would be futile to raise it," *id.*, simply means that a futile claim is not *forfeited* by the failure to raise it.

In this case, because Calla Mejia knowingly waived the asylum issue, there simply is no error and nothing for this court to review. The majority therefore errs by rejecting the government's argument that Calla Mejia waived any right to seek review of the asylum issue. Nothing in *Selgeka* requires a contrary conclusion.

### III.

In the federal judicial system, proceedings before the Courts of Appeals are not de novo affairs where the appellate judges decide the facts for themselves and resolve all legal issues without any regard for what happened below. Instead, the job of an appellate court is to review and correct prejudicial legal errors made by district courts or administrative tribunals. In this case, however, there is nothing for us to review, because no tribunal or administrative agency has even considered the asylum issue, much less erred in resolving it. With respect to the opinion of my colleagues in the majority, I must dissent from the majority's decision that we have jurisdiction to decide Calla Mejia's

asylum claim.[2]  I concur in the majority's decision that we lack jurisdiction to decide the balance of Calla Mejia's petition for review.

---

[2] Because I believe this court lacks jurisdiction over it, I express no opinion on the proper resolution of the asylum issue raised by Calla Mejia.